THE STATE v. SUMMAR, *Appellant*.

Division Two, March 15, 1898.

1. **Practice:** CRIMINAL TRIALS: CALLING IN JUDGE OF ANOTHER CIRCUIT. Defendant, by charging prejudice, disqualified the regular judge, and his counsel announced that he would agree upon an attorney to try the cause or agree to the election of one. The prosecuting attorney declined both propositions, and the court made an order calling in the judge of an adjoining circuit to try the case, before whom the trial was had. *Held*, that it is not obligatory upon the prosecuting attorney to

agree upon a member of the bar to try the cause, *and*, as he failed to give his consent to that plan, it became the duty of the judge to call in another regular judge to try it.

2. **Instructions:** DEFENDANT'S COMPETENCY AS A WITNESS. This instruction was given by the trial court: "The defendant is a competent witness in his own behalf and his testimony is to be weighed by the same rules that govern the testimony of other witnesses, but in passing upon the weight to be given his testimony you may take into consideration the fact that he is the defendant in the case and his interest in the result of the trial, *and you are not to reject his testimony, if believed to be true, simply because he is the defendant.*" The words in *italics* were inserted out of abundant caution and are not considered harmful.

3. **Practice:** SPELLING OF WORDS. The appellate court can only look to the record to ascertain the way words were spelt in the verdict.

4. **Defiling Female:** PRIOR REPUTATION. Under the statute making it a crime to defile a female under eighteen by any person to whose care and custody she has been confined, it is immaterial whether she is chaste or unchaste. Whether she consents to the sexual intercourse or not, the person to whose care or protection she is confided may not defile her without violating the law.

5. ——: ——: VERACITY OF PROSECUTRIX. But the general reputation of the prosecutrix for chastity at the time of the trial is admissible evidence as affecting her credibility as a witness. The impeaching witness must state what that reputation is at the time she testifies, based upon his past and present information. (BURGESS, J., holding that evidence of unchastity is not admissible for purposes of impeachment.)

6. **Evidence:** REPUTATION. Reputation can not be established in a day, but when a witness is to be impeached the issue is, what is his reputation now. In this case the crime was laid in 1894, and witnesses were permitted to testify without restriction as to the reputation of the prosecutrix for unchastity at any time from 1894 down to the time of the trial in June, 1897. *Held*, that no error was committed in excluding evidence prior to that time.

7. ——: DEFILING FEMALE: CONFIDED TO THE CARE OF ANOTHER: EMPLOYMENT. The evidence in this case is extensively reviewed, and the conclusion reached that it plainly and overwhelmingly showed a confiding to or employment by defendant within the meaning of the statute, although the girl's father testified on cross-examination that she was staying at defendant's without his consent.

8. **Practice:** REMARKS OF COUNSEL. The special counsel for the State, in discussing the defendant's effort to impeach the girl's chastity, said: "A defendant who has ruined the character of a girl, and taken

from her her most precious gem, who will come into court and try and take advantage of his own wrong, is an infamous scoundrel." *Held* to be strong language, but justified under the evidence and the attempted defense.

*Appeal from Polk Circuit Court.*—HON. JAMES T. NEVILLE, Judge.

AFFIRMED.

*Rechow & Pufahl* for appellant.

(1) The indictment is vague and indefinite. It does not charge that the offense was committed in Polk county. It does not allege the sexual act to have been felonious. (2) The judge who tried the case had no jurisdiction for the reason that there was no opportunity given the defendant and the prosecuting attorney to agree upon some attorney present to try the case or to elect one. *State v. Gilmore*, 110 Mo. 3; *State v. Higgerson*, 110 Mo. 214; *State v. Newsman*, 129 Mo. 155; *State ex rel. v. Wear*, 129 Mo. 620; *State v. Silva*, 130 Mo. 443; Acts 1895, p. 164, sec. 4178. There must be an election and refusal to serve before the court can call in a judge of another circuit. Acts 1895, p. 164, sec. 4178. (3) The defendant's instruction in the nature of a demurrer to the evidence, at the conclusion of the evidence, should have been given. *State v. Arnold*, 55 Mo. 90; *State v. Young*, 99 Mo. 288. (4) Instruction number 9 given by the court is not the law, and has been repeatedly condemned by this court. *State v. Austin*, 113 Mo. 543; *State v. Hobbs*, 117 Mo. 621. (5) The defendant should have been permitted to prove the general bad character of the prosecutrix for virtue and chastity at the time of the alleged offense, to effect her credibility as a witness. *State v. Shields*, 13 Mo. 236; *State v. Breeden*, 58 Mo. 507; *State v. Miller*, 71 Mo. 590; *State v. Grant*, 79 Mo. 133; *State*

*v. Shroyer*, 104 Mo. 447; *State v. Raven*, 115 Mo. 422; *State v. Sibley*, 131 Mo. 531; *State v. Clawson*, 30 Mo. App. 143; *Davis v. Commonwealth*, 23 S. W. Rep. (Ky.) 586; *Brown v. Perez*, 34 S. W. Rep. (Tex.) 725. (6) The remarks of the attorney in his closing argument were, under the circumstances, highly prejudicial. *State v. Jackson*, 95 Mo. 652; *State v. Young*, 99 Mo. 682; *State v. Ulrich*, 110 Mo. 365; *State v. Fisher*, 124 Mo. 464; *State v. Bobbst*, 131 Mo. 338.

*Edward C. Crow*, Attorney-General, and *Sam B. Jeffries*, Assistant Attorney-General, for the State.

(1) The indictment in this case is sufficient. It correctly lays the venue and charges the offense in the language of the statute creating it. (2) The record shows that the attorney for the State would not agree upon one of the attorneys at the bar to try the case. It was his prerogative, regardless of the opinion of the court or of the defendant. The entry of record by the court that there were attorneys present in court who were qualified to try the case goes for naught as against the desire or opinion of the attorney for the State. Acts 1895, p. 164. Moreover, the objection should have been renewed before Judge Neville at the time he took charge of the case. (3) Instruction number 9 is not subject to the criticisms in the cases cited by appellant in his brief. In fact, the objections there found are carefully and clearly avoided. "You are not to reject his testimony, if believed to be true, simply because he is the defendant." These words, instead of being prejudicial to defendant, are favorable to him and tend to destroy the common law rule and general belief that the defendant is not a competent witness in his own behalf on account of the inducement offered to falsify. (4) No error was committed in refusing to

permit defendant to introduce evidence as to the bad character of the prosecuting witness at the time of the alleged offense. The question as to whether she was chaste or unchaste at the time of the offense is of no moment in this case as affecting defendant. The only object for which such testimony could be used would be to discredit or break down her testimony. The court, therefore, did right in restricting the evidence to the general reputation of the girl at the time she testified in the case. *State v. Duffey*, 128 Mo. 558; *State v. Houx*, 109 Mo. 656. (5) The evidence in this case is of sufficient strength to warrant the jury in finding that the girl was "confided" to the care and custody of defendant, as contemplated by the statute. *State v. Napper*, 141 Mo. 401.

GANTT, P. J.—The defendant was indicted at the April term, 1895, for defiling and carnally knowing Lucy M. Davis, a female under the age of eighteen years who had been confided to his care or protection while she remained in his care and custody, and was tried and convicted and sentenced to imprisonment in the penitentiary for two years. He appeals from that conviction and sentence.

The indictment is in these words:

"The grand jurors for the State of Missouri, summoned from the body of Polk county, empaneled, charged and sworn, upon their oaths, present that J. D. Summar, late of the county aforesaid, on the 12th day of November, 1894, at the county of Polk, State aforesaid, being then and there a person to whose care and protection one Lucy M. Davis, a female under the age of eighteen years, to wit, of the age of fifteen years, had been and was then and there confided, her, the said Lucy M. Davis, unlawfully and feloniously did defile, by then and there unlawfully and feloniously carnally

knowing her and having carnal knowledge of her body, while she remained in his care and protection, custody and employment, she, the said Lucy M. Davis, being then and there confided to the care, custody and employment of the said J. D. Summar, against the peace and dignity of the State." The arraignment was in due form and a plea of not guilty entered by defendant.

The evidence tended strongly to establish these facts. Lucy M. Davis is the daughter of M. G. Davis and Mary E. Davis, his wife. The defendant is an uncle, by marriage, of Lucy Davis, having married her mother's sister. The two families of M. G. Davis and J. D. Summar, the defendant, lived in the same neighborhood in Polk county in this State within forty rods of each other, during the year 1894. Lucy Davis, the prosecutrix, was fifteen years old on the eighth of April, 1894. In the spring of 1894, about the tenth of March, her father was about to move his home. The defendant requested Lucy's parents to let her go and stay with his wife, saying that if they would do so he would come and help them move. A few days after her parents had become settled in their new home and while Lucy was still at defendant's house, defendant came to see her parents and asked her father to let her remain at defendant's house through the anticipated confinement of his wife. He stated to them that if they would let her stay through his wife's sickness he would treat her as one of his family and one of his own children. The father of the prosecutrix told him that Lucy could stay during her aunt's sickness if he would treat her as one of his family. Under this arrangement the girl remained with defendant under his care until sometime in June when another relative, a daughter of James Acuff, who had married her father's sister, became sick and they requested the prosecutrix to come and help them

during her illness, and she went to Acuff's and assisted until the latter part of August or first of September, when she returned to defendant's house, left her clothing and then came to her father's home. That afternoon she and her sisters went to the defendant's house to get a bucket of water and defendant's wife induced her to stay and get supper, and she remained there, and did not return home with her sisters. A day or two after this the mother of prosecutrix testifies that the defendant told her he wanted Lucy to stay at his house and go to school. He said he would send her to school and take care of her and treat her as one of his own children. She told him she would rather for her to come home and go with her sisters. Defendant said if "I would let her stay there and go to school he would furnish her books and let her go to school and she could help do his work night and morning." The father of the girl testified that when the defendant asked his consent to having the girl stay at his house, that he didn't want her to stay at defendant's, but he acquiesced in the arrangment simply to avoid a fuss, and he did not go and take her by force after the defendant insisted on her staying. She kept her clothing at defendant's house and her washing was done there. William Hyder testified that in a conversation with him in the fall of 1894 defendant said he had taken Lucy "to raise and take care of the same as his own family, as his own child, and that he was going to take her with him, referring to his moving to Taney county." T. J. Hawkins testified he married defendant's wife's sister. In the fall prior to defendant's moving away the prosecutrix was living at defendant's house and the witness heard a conversation of defendant with witness' wife as to how Lucy was living with him, and defendant said "he had taken her and she was living there as his own child." Defendant testi-

fied, and did not deny any of the statements attributed to him by the girl's parents that if they would let him keep her he would send her to school, buy her books and treat her as his own child, and did not contradict the statements of Hyder and Hawkins that he had agreed to treat her as his child. The evidence tending to prove that he had carnal knowledge of the girl in his own house during the time she lived with him consisted of the girl's direct testimony to the fact, and the circumstances, and of his efforts to get the witness Mann to marry her, offering to furnish him land and a team to work it if he would do so, also his effort to get Hyder to take the girl to Ashgrove and put her upon the midnight train for Springfield, where defendant would meet her. Her testimony that he gave her $25 to pay her expenses while away from home, after he discovered she was pregnant; his effort to get her to go to Tennessee until her child should be born —all this and much more tended strongly to prove he was the father of her illegitimate child. No denial of any portion of it was made by defendant when testifying. He contented himself with an attempt to impeach the evidence of the prosecutrix by showing her character for virtue was bad *prior* to the time of the defilement, and at the time of the trial, and by simply saying when on the stand *he never had any improper relation with her*. The jury were left to infer what his standard of propriety was without the benefit of his views on the subject. Directly impeaching his statement was the evidence of his sister-in-law, Mrs. Owens, who certainly was not an unfriendly witness, to the effect that he stated to her "that he didn't deny the charge they had made, but that he was not the first one that ever bothered Lucy Davis;" "that he didn't deny having connection with Lucy Davis or intercourse, but he said he was not the first one." The

other facts will be stated in connection with the propositions assigned for reversal of the judgment.

I.    The right of Judge Cox, the regular judge, to call in Judge Neville, the judge of the Springfield circuit, to try the case is denied by defendant.  Judge Cox was rendered incompetent to hear the cause by reason of an application by the defendant charging him with prejudice and supported by two compurgators. The application was in due form and was sustained and thereupon defendant's counsel announced that he for defendant would agree upon some attorney to try the case, or would agree one should be elected.   Judge Abbe, special counsel for the State, declined to agree upon an attorney or consent to an election, though there were more than five attorneys present possessing the qualifications of a circuit judge and the court thereupon set down the case for trial on March 29, 1897, and made an order requesting Judge Neville, of the twenty-third judicial circuit, to try said cause and adjourn the hearing till that day.   In obedience to this request Judge Neville went to Polk county and tried the cause at the appointed time.

Section 4175, Revised Statutes 1889, permitted the members of the bar present to the number of three or more, duly enrolled in said court and licensed attorneys of this State who were not of counsel in the cause pending, to elect a special judge in a criminal cause; but that section and its kindred section 4177 was entirely repealed by the General Assembly in 1895 by an act approved March 18, 1895, Laws of Missouri 1895, pages 162, 163, and a new section known as section 4175 enacted in its stead.   By this new section it is provided that when the regular judge is disqualified either by the affidavits of the defendant and his compurgators, or his incompetency for any of the causes

enumerated in section 4174, Revised Statutes 1889, is known to the judge himself, "the defendant and prose-cuting attorney may by agreement in writing, with the concurrence and approval of the court, elect some attorney at law who possesses all the qualifications of a judge of the circuit court to act as special judge." No provision whatever is made for an election by the members of the bar, and as this system of selecting a judge contravenes the general policy of the State which requires the qualified electors to select the judges of our circuit and criminal courts, this law must be limited to its express terms. This court is not author-ized by loose construction to engraft any new provi-sions upon the statute. Ample provision is made for the trial of every such cause by a duly elected or appointed judge and the legislature most clearly so thought when it repealed the only two sections of the criminal practice permitting such election. The other proposition that this section made it absolutely obliga-tory upon the prosecuting attorney to agree with the defendant upon an attorney to act as special judge finds not the least support in the act of 1895 above cited. The whole tenor of the act is to merely confer a privilege upon the prosecuting attorney of which he may avail himself or not as he sees fit. The prosecut-ing attorney did not consent to select an attorney as special judge and it thereupon became the duty of the regular judge to call in another regular judge and in so doing he committed no error but followed the plain mandate of the statute.

II.    The objection that the indictment is indefinite and does not allege that the sexual act was felonious is without merit. It charges the offense substantially in the language of the statute and has been approved in previous prosecutions on that act.

III. The ninth instruction given by the court is in these words:

"9. The defendant is a competent witness in his own behalf and his testimony is to be weighed by the same rules that govern the testimony of other witnesses, but in passing upon the weight to be given his testimony, you may take into consideration the fact that he is the defendant in the case and his interest in the result of the trial, and you are not to reject his testimony, if believed to be true, simply because he is the defendant." This instruction not only varies the form of the instruction condemned by this court in *State v. Austin*, 113 Mo. 538; and *State v. Hobbs*, 117 Mo. 620, but is substantially different. The instruction must be conceded to be correct if it had omitted the last clause in these words, "You are not to reject his testimony, *if believed to be true*, simply because he is the defendant." This clause was inserted out of abundant caution in the interest of defendant, and we can discover nothing harmful in it.

IV. The point as to the spelling of the word "penitentiary" in the verdict must be determined against defendant because it is not sustained by the record to which alone an appellate court can look.

V. The learned counsel for defendant argued with great earnestness that the circuit court erred in excluding evidence offered to prove that at the time of the commission of the offense and prior thereto the general reputation of Lucy Davis, the prosecutrix, for virtue and chastity was bad in the neighborhood in which she lived. The learned circuit court while excluding that offer ruled that he would permit defendant to prove her general reputation for unchastity at the time of the trial to impeach her testimony. The competency of evidence depends upon the issue to be tried. Unquestionably upon a question involving the consent or

non-consent of a female to sexual intercourse when
she has arrived at the age of womanhood, her reputa-
tion for chastity at the time of the intercourse would
be appropriate and admissible, but under the statute
upon which this prosecution is based it is utterly im-
material whether a female under the age of eighteen is
chaste or unchaste. Whether she consents to the in-
tercourse or not the person to whose care or protec-
tion she is confided may not defile her without in-
curring the penalty of the act. *State v. Willoughby*,
76 Mo. 215. As was said in *State v. Strattman*, 100
Mo. 540, "the statute levels its denunciations and pen-
alties against every one to whose care or protection
any female under the age of eighteen is confided, who
violates the trust reposed in him in the manner that
section condemns. Unchaste to all the world beside, she
must be pure to him. This is the evident policy and
central idea of the statute." Her unchastity at the time
of the commission of the offense then as to him would
be no defense if he had carnal intercourse with her.
It is obvious that the purpose of this examination was
to excuse the conduct of defendant. Her general
reputation in that regard could only affect her evidence
as a witness and all the cases cited by the counsel re-
quire that evidence to be as to her general reputation at
or near the time of the trial as attainable. The mate-
rial object of inquiry is the character of the witness at
the time he or she testifies. It is his or her present
credibility that is to be attacked, and while the know-
ledge of the impeaching witness may extend some con-
siderable time in the past he should state what that
reputation is at the time she testifies, based upon his
past and present information. Reputation can not be
established in a day, but when a witness is to be im-
peached the issue is what is his reputation now. *Fisher
v. Conway*, 21 Kan. 25; *Stratton v. State*, 45 Ind. 468;

*Willard v. Goodenough*, 30 Vt. 393. This court in *Wood v. Matthews*, 73 Mo. 482, held that an inquiry back of three years was too remote to admit the testimony. Now in this case the witnesses were permitted to testify without restriction as to the reputation of the prosecutrix for unchastity at any time since the year 1894 and the trial was had in June, 1897. These witnesses knew her reputation down to the very time of the trial. Under these circumstances we think no error was committed in excluding evidence prior to that time.

VI. Finally, it is urged that there was no such evidence of a confiding to or employment by defendant of the girl as would bring this case within the statute, although the evidence that he had defiled her was amply sufficient. This argument is based upon answers of the father in his cross-examination to the effect that the prosecutrix was staying at her uncle's without his consent. No account whatever is taken of the full scope of the father's testimony or her mother's or of the defendant's statements made over and over to various other witnesses and neighbors that "he had taken the girl under an agreement to treat her as one of his own children" and "send her to school and furnish her school books." It omits all reference to how the girl came to go to defendant's house in the first instance, to assist in doing the house work during the confinement of defendant's wife. Her going to Acuff's, another uncle, to help in sickness, is treated as a complete termination of the consent of her parents to her living with defendant's family. Whereas the evidence shows that upon her return from Acuff's she came to defendant's house and that her clothing was left there; that while there she went to a picnic with her sisters from her father's house. That afternoon she again returned to defendant's house and remained

there, not coming home with her sisters. The next
day or the day following defendant again sought the
consent of her parents to let her remain with him,
promising to treat her as his own child, send her to
school and furnish her books, etc. While it is per-
fectly true that the father says he told him he wanted
her to come home, it is perfectly clear that he in fact
acceded to the importunities of defendant and per-
mitted her to remain under the conditions proposed
by defendant. That defendant so understood the
arrangement is testified to by disinterested witnesses to
whom he related his contract with the father. The
failure of the father to require her to come home is
inexplicable upon any other theory, and his consent in
fact was fully established notwithstanding he demurred
to the arrangement when it was first proposed. It is
plain that though reluctant to do so in fact, he did
permit defendant to keep the girl on the terms defend-
ant proposed. That a relation of trust and confidence
was thereby created which defendant is estopped from
denying, we think is clearly established and brings the
facts clearly within the decisions of this court in *State
v. Young*, 99 Mo. 284; *State v. Strattman*, 100 Mo.
540; *State v. Sibley*, 131 Mo. 519; *State v. Napper*,
141 Mo. 401; *State v. Kavanaugh*, 133 Mo. 452.
That this girl of fifteen was under the roof of defend-
ant under an agreement to labor for him and his
family, is perfectly plain, and that he had obligated
himself to send her to school, buy her school books
and give her the protection and care that he would if
she were his own child, is not only proven, but not
even denied by defendant when on the stand in his
own behalf. As said by SHERWOOD, J., in *State v.
Strattman*, when it was sought to acquit because of a
statement by the prosecutrix that she was forced,
"this is a case where actions speak louder than words."

State v. Summar.

There is not a word of evidence tending to show that the girl was a disobedient child to her parents. The effort to show that she had run off was entirely abortive. The father explained to the court that when he answered that the girl went without his consent that he meant his *express will;* that he yielded against his better judgment to the solicitation of defendant and because there had been some difficulty between himself and defendant's wife and he desired to keep down any further disagreement. He said "I worked the best I could to get her home and get her away from there without any fuss." From the conduct, situation and relation of the parties there was sufficient evidence to justify the jury in finding as they did that the girl was confided to defendant's care.

VII. It would appear that Judge Abbe, special counsel for the State, in discussing the effort to impeach the girl, used words substantially to this effect: "A defendant who has ruined the character of a girl, and taken from her the most precious gem, who will come into court and try and take advantage of his own wrong, is an infamous scoundrel." This is strong language but we agree with the learned counsel that if the defendant did debauch this girl who bore the relation of a niece by marriage, and was the father of her illegitimate offspring, and her character for chastity was thereby destroyed among her neighbors and when she appeared as a witness against him, sought to destroy her evidence by proving she had a bad reputation for chastity, we know no language more befitting his conduct, or descriptive of his character than that used by counsel. The judgment is affirmed. SHERWOOD and BURGESS, JJ., concur; BURGESS, J., holding that evidence of unchastity was not admissible at all to impeach the credibility of the prosecutrix.