# THE STATE v. CALLAWAY, Appellant.

Division Two, February 6, 1900.

1. **Continuance:** APPLICATION: WHEN NOT PRESERVED IN BILL. Where applications and affidavits filed for a continuance were not preserved in the bill of exceptions, though the bill shows that exceptions were taken to their denial, they can not be considered on appeal.

2. **Divisions of Circuit Court:** TRANSFER OF CAUSE: PRESUMPTION. Where the record shows a cause to have been transferred from one division of the circuit court to another, it will be presumed on appeal to have been properly transferred.

State v. Callaway.

3. ———: ———: NO EXCEPTIONS: JURISDICTION. An *improper transfer of a cause from one division of the circuit court to another does not abate the jurisdiction of the court to which it was transferred, when no exception was saved at the time of making the order to transfer.*

4. **Change of Venue**: AFFIDAVIT: SUFFICIENCY. Under Laws 1895, p. 162, requiring that a petition for change of venue be supported by the affidavit of at "least two credible disinterested citizens" of the county where the cause is pending, affidavits describing the affiants as "reputable citizens," and not stating their place of residence, were insufficient.

5. ———: NOTICE TO PROSECUTING ATTORNEY. Under Acts 1895, p. 162, requiring that a reasonable previous notice of application for a change of venue be given the prosecuting attorney, an application was properly refused where no such notice was given.

6. **Divisions of Circuit Court**: TRANSFER: SUBPOENAING WITNESSES: CONTINUANCE. *Where, on a transfer of a cause from one division of a circuit court to another, defendant's witnesses who had been summoned were ordered to appear before the division to which the cause was transferred, such transfer constituted no ground for a continuance.*

7. **Change of Venue**: PREJUDICE OF JUDGE: SECOND APPLICATION. One change of venue having been granted on grounds of prejudice of the judge, a second change on the same grounds was not allowable.

8. **Murder of Wife**: FIRST DEGREE: CASE STATED. Where defendant made a sudden and unprovoked attack on his wife, saying that he would kill her and was only prevented from doing so by the interference of others, and frequently thereafter made threats against her, saying that, before she should have a divorce for which she had applied, he would ruin her name (though admitting that she was guiltless), and threatening to make way with her, and finally entered a store where she was working, and, after talking with her a few minutes, without provocation drew a pistol and shot her, seized her by the shoulder and fired again, and then deliberately walked around the counter, behind which she had fallen, and fired three more shots into her body, after which he coolly surrendered himself, such facts were sufficient to justify a verdict of murder in the first degree.

9. ———: UNDER INFLUENCE OF PASSION: MANSLAUGHTER. Since the only circumstances which justify an instruction for manslaughter in the killing of a wife by the husband are where the wife was taken in adultery, or encountered immediately after she had quitted the company of her paramour, it was error to instruct that if defend-

ant, at the time of killing his wife, was so far under the influence of passion aroused by "any" previous conduct of the deceased as to make him incapable of thinking coolly of the natural results of his acts, he was guilty of manslaughter in the fourth degree.

10. ———: PROVOCATION: INSTRUCTION. An instruction on the theory that defendant killed his wife in heat of passion provoked by her conduct, when there was no evidence of provocation, and none that the killing was otherwise than premeditated and with malice aforethought, was erroneous.

11. ———: EVIDENCE: ASSAULTS: THREATS: DIVORCE: MALICE. On the trial of defendant for the killing of his wife, evidence that he had formerly assaulted her and had threatened her life, and that she had been compelled to bring suit for divorce, was competent to show malice.

12. ———: ———: LETTERS TO THIRD PARTY. On the trial of defendant for the killing of his wife, letters written by him to a third party, in which he had threatened to ruin her character and to sue for divorce, and showing his improper relations with other women, were admissible as showing want of affection, thus disclosing a motive.

Appeal from St. Louis City Circuit Court.—*Hon. John A. Talty*, Judge.

AFFIRMED.

*Edward C. Crow*, Attorney-General, for the State.

(1) Division No. 8 of the circuit court of the city of St. Louis, Mo., had jurisdiction of the case. The record affirmatively shows that the court in No. 8 did not pass on the plea to the jurisdiction until the transcript from division No. 9, together with all the original papers were filed in No. 8. This being so, it disposes of the question. (2) In a change of venue in a criminal case, the original indictment should be retained in the office of the clerk and a copy only should be included in the transcript. Ruby v. State, 7 Mo. 206. (3) The defendant set up mental irresponsibility. He attempted to prove by the witness Martin that he was mentally unbalanced.

This defense opened the inquiry into his general life. Therefore the two letters he wrote from Chicago to Mr. Horton were competent on that ground. State v. Duestrow, 137 Mo. 86. The letters showed the defendant was having improper relations with another woman. Therefore the evidence was proper as showing a motive which might prompt him to get rid of his wife. Wharton's Crim. Law (9 Ed.), sec. 785; State v. Duestrow, 137 Mo. 86. (4) I have been unable to find in the bill of exceptions or in the record proper, any regular application for a continuance. It is true, complaint of it is made in the motion for a new trial. But facts stated in the motion for a new trial are not proved by the motion itself and as there is nothing in the record to show what the application was, this complaint can not be considered here. State v. McDaniel, 94 Mo. 306; State v. Bulling, 105 Mo. 226; State v. Welsor, 117 Mo. 571; State v. Foster, 115 Mo. 451. (5) The application filed June 19th, 1899 and sustained by Judge Klein was an application for a change of venue disqualifying Judge Klein. The defendant was concluded by this, as he could have only one application sustained on account of the prejudice of the judge.

SHERWOOD, J.—The murder of his wife and his conviction and sentence therefor, cause this appeal by defendant.

Before proceeding to discuss the cause on its merits necessity exists that disposition be made of some matters preliminary to the main issue. And in this discussion, prefatory and otherwise, it is proper to say that no counsel appeared in this court on behalf of defendant, and that though counsel were granted one month's time in which to prepare a brief, none has been filed. We are left, therefore, to the record alone to determine whether error is to be found therein, and so we will examine the various steps which were preserved in the bill of exceptions, and in passing, advert to others not thus preserved.

The record proper shows that this cause was assigned by the circuit court judges of St. Louis in general term to division No. 9 of that court; it also shows that on defendant's application the cause was transferred by change of venue to division No. 8 of that court over which Judge Talty presides.

A motion was filed by defendant, it seems, to dismiss the cause "for the reason that the court has no jurisdiction of said cause, for the reason that the transcript of the proceedings had in division number nine, presided over by the Hon. Jacob Klein has not been filed herein according to law." Before this motion was passed upon, however, the transcript was filed and the motion was denied, but no exception was saved to such denial. As to applications and affidavits for a continuance filed by defendant and others, it is enough to say that these applications have not been preserved in the bill of exceptions, and in consequence can not be noticed by us, though the bill of exceptions shows defendant excepted to the applications being denied. If defendant desired successfully to charge the court with error in denying such applications, he should have preserved them, and then we could have examined into their sufficiency; otherwise not, as there is no presumption in favor of the validity of such papers. And it is well enough to say that the record having shown that the cause was transferred from division 9 to division 8, it will be presumed to have been properly, and not improperly, done; and even if improperly done, this would not abate by one jot nor one tittle the jurisdiction of divisions 8 of that court, if, as is the case here, no exception was saved at the time of making the order. [State ex rel. Herriford v. McKee, 150 Mo. 223.] And the Act of 1895 as construed by this court in State v. Thompson, 141 Mo. loc. cit. 413-14, fully authorized the transfer of the cause from division 9 to division 8. Nor is there anything in the act of March 26th, 1895, which gives countenance to the idea that after a cause has been assigned to a division of the court by the general term, there must be a re-assignment when the

cause is to be transferred to another division.   As all witnesses who were summoned to appear in division No. 9 being ordered by that division to appear before division No. 8, they were in contemplation of law summoned to appear before the latter division, and hence there was no excuse for defendant not being ready for trial.   He either had or had not his witnesses subpoenaed to appear before No. 9, and if he had not that would be an entire lack of diligence on his part, and therefore he could not complain; and certainly the mere say so of attorneys that they were not ready to proceed with the trial of the cause counts for nothing.

Relative to the change of venue applied for before division No. 8 on the alleged ground of the prejudice of the judge, a change of venue having been applied for, for the same reason before Judge Klein, and granted, a second change was not allowable.   [State v. Anderson, 96 Mo. 241.]

Besides that, the petition for the change of venue was not proven as required by the amendatory act of 1895.   [Laws 1895, 162; State v. Tatlow, 136 Mo. 678.]   Nor was the petition supported by the affidavit of at "least two credible disinterested citizens of the city of St. Louis," as required by section 2 of that act.   The affiants in this case only describe themselves as, "We the undersigned reputable citizens not of kin," etc., not giving their place of residence, nor describing themselves as *"credible disinterested citizens."*   Such supporting affidavit would be bad even under the old section 4156 in the Revision of 1889, nor was any notice given of the intended application for the change, as also required by the original section as well as by the amendatory one given.   The application for a change of venue on any one of the grounds mentioned, was therefore properly denied.

Having disposed of the preliminary questions in this cause as above set forth, it is in order to discuss those features of it which pertain to its merits.   The evidence, in outline, is this: The defendant, a young man about 25 years of age, was the

son of Mr. and Mrs. Samuel Callaway of Fredericktown, Mo., where the defendant was reared.   The parents sent him to St. Louis, Mo., to attend the Missouri Medical College, and while attending this school in 1895 he met Anna P. Callaway, his wife, who was then a school girl of about 16 years of age in St. Louis, Mo., and who lived with her sister and her sister's husband, Mr. and Mrs. Hawkins.  The defendant and she were married while the defendant was yet attending the medical school in St. Louis, Mo., and went to live with her sister, Mrs. Hawkins.   The parents of the defendant sent the money from time to time to pay the board of the defendant and his wife up to the summer of 1898, when from some cause, about August, the remittance did not come to pay the board, and the sister-in-law, Mrs. Hawkins, and her husband, depending upon daily wages for a living themselves, notified the defendant that while they were willing to support his wife and child, yet that so far as he was individually concerned, they could not afford to board him as he was not doing any work; and all the witnesses who speak on the subject, say defendant did no work.

The defendant never got along very well with his wife, being of a petulent, jealous and suspicious disposition.   Soon after the marriage of the two, the defendant took his wife to visit his parents at their home about 30 miles south of St. Louis, Mo., but soon returned to Mr. Hawkins's.   In the summer of 1896, they again went to the parents of the defendant during the vacation of the medical college term.   There was some evidence by the mother of the defendant that his wife worried the defendant while at the mother's house by flirting with other men, and the mother of the defendant testified that the defendant objected to this and would cry about it.   The defendant's mother also testified that on one occasion, her daughter-in-law wrote a note to some gentleman in Fredericktown, but it nowhere appears what was in the note or that it contained anything wrong.   The evidence showed that defendant's wife always conducted herself as a virtuous woman.

The defendant and wife and their little child, a little girl, which was born in February, 1897, were at Mrs. Hawkins's home (with whom she had lived since she was four or five years old) on the evening of September 13, 1898, at supper time, and after supper one of the neighbors came in, Mrs. Horton, and Mr. Hawkins started up stairs with the newspaper and the defendant was fixing his valise when suddenly he threw the valise out into the yard, over the head of Mrs. Horton, and struck his wife three times, knocking her down the third time, and he then kicked her in the head with his foot, causing a serious and painful wound, from which the blood spurted in a stream, spattering on the walls and the clothing of his wife, and giving her a scar on her head which she carried to her grave.    Mrs. Horton and Mrs. Hawkins grabbed the defendant to try and prevent his further injuring her and in the struggle the coat of defendant was torn. Mr. Hawkins hearing the screams ran down stairs and pushed the defendant off from the prostrate form of his wife and the wife arose and ran bleeding to the front door and the defendant struck Mr. Hawkins, knocking him down. At this time, Mr. Horton, living next door, and the husband of Mrs. Horton, having heard the screams, came into the front door and met Mrs. Callaway, weak and almost fainting from fright, wounds and loss of blood, and assisted her into the arms of his sister who had followed him and then passed into the room where the defendant and Hawkins were and interferred between them and finally took the defendant to his home.

The defendant had been packing his valise to go to Chicago, Ill., to go to work, and as he threw it out into the yard as above described, he remarked to his wife, that he would kill her; that he had got tired of seeing her around.    When the defendant got to the home of Mr. Horton, the mother-in-law of Horton was asked by Horton to fix the torn place in the coat of the defendant and the old lady asked the defendant if he was not glad the Lord had prevented him from commit-

ting murder and he replied that he "did not know, that he would do it yet."

When Horton went into the room where the assault happened and spoke to Callaway, he remarked to Horton he would do it yet.   Horton went with Callaway to the station and Callaway went to Chicago and remained a short while.   His wife and he never lived together after the assault on her on September 13th, 1898.   The defendant shortly after returned from Chicago and was in and around St. Louis up to the time of the killing which happened April 11, 1899.

Defendant's wife, with her little girl baby, remained at her sister's Mrs. Hawkins's, and in November, 1898, sought and found employment as a saleswoman in the department store of Seigel, Hillman & Co.'s, on the northeast corner of Broadway and Washington avenue in St. Louis, Mo.

Some time during the winter of 1898, or the spring of 1899, she began divorce proceedings against the defendant in the circuit court of St. Louis, Mo.   This, it seems, greatly angered the defendant who repeatedly stated he would make away with himself, his wife and the child before she should have a divorce.   He also tried to dissuade Horton, a witness, from testifying in his wife's divorce suit, and witness from letting his wife testify in that suit.   Speaking on the same subject, the divorce suit, to Mrs. Hawkins, his wife's sister, defendant said that if his wife went on with that suit, he "would ruin her name so people would turn away from her on the street."   At the same time he told Mrs. Hawkins, that he "never intended to live with his wife, any how, but he intended to get a divorce" himself.

Finally about two weeks before the killing, the defendant called at the store and asked his wife to go and talk over the matter with him and she consented and went to the office of her attorney.   She told him in the store on that occasion, that, while he would ask her to go with him, yet he did not have then and never had had a place to take her and her child to,

and that she did not then have and never did have any home but the one with her sister, Mrs. Hawkins.

The talk at the attorney's office was very unsatisfactory and he was told to send his attorney (he having stated he had one) to see her attorney. The defendant came back to the store of Seigel, Hillman & Co.'s on the afternoon of Monday, April 11, 1899, a little before five o'clock and went up to the second floor to the underwear department where his wife was .employed. She saw him coming, and being afraid of him, she remarked to Miss Beckie Evans, a saleswoman working near her, that there was her husband coming, and asked Miss Evans where she could hide, and Miss Evans said behind some curtains, and she did so, and her husband, not seeing her, went down on the elevator, going to the lower floor on the same elevator with Miss Evans who was called down for some cause to the lower floor. Miss Evans soon returned.

Mrs. Callaway evidently thought defendant was gone, for she came from behind the curtains and went to work. But in a very few minutes defendant appeared on the floor again, having returned, and seeing his wife, smiled, raised his hat, bowed to her, and walked quietly to where she was behind the counter.

She was heard to ask him what he wished, and then the two walked down towards the end of the counter talking, she behind it and he on the outside. They quietly conversed a few minutes after reaching the end of the counter, when the defendant, without any provocation or any previous demonstration, drew a revolver and fired at his wife and as the bullet struck her, she staggered and reeled and he caught her by the shoulder and fired again and she fell behind the counter, and he stepped around and leaned above her body and fired three more balls into her person. He then coolly turned and walked to the floor manager on that floor and said he had shot his wife, and he handed the revolver to the gentleman, who took it and went with the defendant to the first floor where

he was turned over to the officers.    He seemed perfectly calm and said he presumed he would be hanged for what he had done.    Some one asked why he did it and he said his wife had wrecked him, said he had killed her and was glad of it.

It also developed in evidence that defendant was on familiar terms with women in St. Louis, "whose reputations were no longer doubtful," knew them by name, shook hands with them, took drinks and rides with them, and on the Friday afternoon next before the murder, he, with another man and two women, was seen riding by Mrs. Horton and the whole party stopped at Maher's saloon, on the corner of Leffingwell and Walsh streets.    Two letters from defendant were also exhibited in evidence; they were written October 5 and 10, 1898, to the witness Horton, which showed defendant was maintaining improper relations with a woman in Chicago, and inferentially with others in St. Louis; that defendant was going to bring suit for divorce from his wife, in which defendant intended to ask for the custody of his child, and in which, as he stated, he would "bring out several nice family skeletons and throw disgrace all over his wife's family."    After that he met witness Horton and talking about the divorce suit his wife had brought, he said that in that litigation he intended "to throw mud all over his wife."    Whereupon witness advised him not to do this on account of the baby, when defendant said "he would not give a damn for the baby."

A man by the name of Martin testified in behalf of defendant.    This witness was a gentleman of elegant leisure, just like defendant he did nothing.    He was introduced to prove defendant insane, or mentally irresponsible, although defendant's counsel upon the court's repeated questions, refused to interpose the plea of insanity.    Martin had known defendant some 9 years, and some time in February next preceding the murder defendant had a conversation with Martin about the divorce proceedings instituted against him, or rather started to do so.    On this topic Martin stated:

"He started to tell me about the divorce and said he had a divorce pending, and I told him I didn't want to hear it. He spoke to me about the divorce case, and I told him I didn't like to hear any more of it, didn't like to hear any family troubles. That was all that was said."

"Q. Can you tell us at that time when he spoke to you about it what his condition was mentally?"

"The Court: It might not be utterly incompetent and immaterial. The court will rule that it might be material. At any rate, I'll allow the witness to state what in his opinion was the condition of his mind.

"He impressed me as being of kind of unsound mind, the way he spoke and looked. That's the reason I didn't want to hear it.

"Q. Can you describe those actions? A. Well, it was only his facial expression, and his talk seemed to be a little loud.

"Mr. Cunningham: Now if the court please, we desire to offer evidence to support that theory as a defense.

"The Court: The theory of insanity?

"Mr. Cunningham: The theory of irresponsibility mentally at the time of the commission of this alleged crime.

"The Court: Very well, objection will be overruled. Mr. Krone, insanity is a peculiar malady, and the court is not going to rule as to the order of proof in regard to it.

"Q. By Mr. Maurer: Now, you will describe, Mr. Martin, as near as you can, the condition of the defendant at the time he spoke to you about his troubles, how he acted.

"A. He was coming up in an Olive street car at the time he spoke of it, sat in the grip, and when he spoke to me I told him I didn't like to hear it, he seemed to have a wild look in his face, and I told him I didn't want to hear it. That's all I can describe."

Martin also said that he had met defendant on 7th of April, the Friday just before the homicide, met him at 4

o'clock in the afternoon and stayed with him drinking at various resorts until 2 o'clock the next morning and that defendant never returned to the subject of the divorce again and was calm and rational on every subject except at the meeting in February, and then only on the subject of the divorce and only to the extent or apparent extent as above stated.

The substance of Robert S. MacDonald's testimony was to the effect that defendant some time in December, 1898 (next after the 13th of September when defendant knocked down, beat and kicked his wife) came to Macdonald's house, somewhat late in the evening, when the following occurred: "I was called down to the parlor of my home one night in December, 1898, by my son, who is an attorney, to see, as I supposed, a client of my son's. I saw Callaway, and he had a handkerchief that had some blood spots on it, and he said he had met a man and had a fight with him and that it was over interference with his relations with his wife, and I asked him to what extent it went, and he said there was nothing criminally wrong about his wife."

MacDonald also testified that defendant called on his son as an attorney, said he had shot the man and had to borrow a hat from a plumber, that defendant asked MacDonald what he had better do, and MacDonald told him to go and surrender himself to the police authorities, and that MacDonald looked in the paper next morning and saw no account of the transaction. This witness was unable to form an estimate as to defendant's mental condition.

Having thus given a synopsis of the testimony, the conclusions to be reached from that testimony concerning the instructions given and objections overruled, will now be considered.

The instructions given by the court of its own motion, ran the gamut of murder in the first and second degrees down to and inclusive of manslaughter in the fourth degree. No objection was made by defendant to these instructions, but

State v. Callaway.

it is urged in the motion for a new trial that "the verdict of the jury is the result of passion and.prejudice," therefore it will not be.improper in commenting on the evidence to speak of the instructions.    The evidence shows in the clearest possible light, a case of murder in the first degree unredeemed by a single palliating circumstance and unmitigated by a single extenuating feature.

A young girl still in her teens, in the flower of her young womanhood yields herself in marriage to the defendant, and gives him nothing but a true and loyal wifely devotion, and in return and recompense, what does she receive? An idle, lazy, dissolute, worthless wretch who did not earn a dollar even for his own support, and who, when his wife would ask him to go with her walking in the evening so as to give their baby an airing in its little carriage, would say he was "too tired," although he'd done nothing all day, and then immediately turn to Cooper or Duke, boarders at Hawkins's house, and ask one of them to go out walking with his wife and baby so as to trundle the carriage, and then when either of them did so, would talk about him and her in an improper way and get foolishly jealous about his wife because she received from men of his acquaintance the most ordinary civilities, which he would most commonly and frequently prompt and promote the reception of by her. Foolishly and pertinaciously jealous of his wife or pretending so to be although he confessed to MacDonald that she gave him no cause for such jealousy, yet he felt perfectly free himself to
                        . . . . . . "Tempt the illicit rove,"
as is abundantly shown by the evidence contained in this record.

Then followed the atrociously cowardly and brutal attack on his wife on the 13th of September, 1898, defendant remarking to his wife as he began the attack, "*I will kill you, I've got tired of seeing you around!*" All this was done simply because his wife not feeling very well declined to accom-

pany defendant to the depot on his departure that evening for
Chicago. Baffled by the interference of others in his evident
designs on his wife, he on the instant and subsequently stated
he would yet take her life. He then goes to Chicago, stays
there some time, and while there writes Horton about his in-
tention to get a divorce from his wife, and throw disgrace all
over her entire family. Returning to St. Louis, he is served
with process in his wife's divorce suit, which immediately
kindles anew his anger towards and his evident hatred of her.
Being doubtless desirous of acting the role of the innocent and
injured party, he desires to have his wife dismiss her divorce
suit, and with that end in view he visits her sister Mrs. Hawkins
the last of November, 1898, or first of December, believing
she would tell her sister and thus intimidate the latter from
continuing her suit, he threatens that if she went on with the
proceedings, "he would ruin her name so people would turn
away from her on the street," but at the same time declares
that "he was going to get a divorce himself, and never in-
tended to live with her anyhow." As this intimidation scheme
failed, he tried another plan as described in the testimony of
Allie Ruby Winter who testified: "I knew Mrs. Callaway
from the time she was six years old. I knew the defendant.
I was, on April 10th, a saleslady at Seigel & Hillman's store.
Mrs. Callaway and I were on the same floor. About two
weeks before the murder, Callaway came to the store to see
his wife. I went to where they were talking. Callaway
wanted her to withdraw her divorce suit and come and live
with him. She asked him where he wanted her to go as she
had never been provided any home, and had none except at
her sister's. She said she would talk it over with him and
agreed to, and did go with him to her attorney's office. She
got excused from the store and went into the basement to get
her things and I talked to Callaway while he waited for her.
He said before she should have the divorce he would make
away with all three of them. He told her when she came back

to where we were that she was afraid he would kill her, but he said he would not, but that he could have killed her as he was in the back yard of her sister's while they were eating supper and looking through the window he saw little Helen look up and his heart failed him. They left the store together. I saw the defendant the day he murdered his wife. He came to the store looking for her and asked where she was. I did not see the killing, but I saw her at once after she was shot and I saw him, and he said she was dead back there."

In that testimony is shown the same threat repeated which defendant so murderously executed about two weeks thereafter, and in which threat still figures the divorce suit, and of his having been about to carry it out by shooting his wife through the window, but was deterred by the upward glance of his little child beside its mother at the supper table.

To another witness about the same time he made repetition of the same threat that sooner than permit his wife to obtain a divorce, he would destroy her, his child and himself. Then shortly followed the culmination of the threats of defendant and of his malice towards his wife. On the 11th of April, 1899, he goes to the store of Seigel-Hillman, inquiring for his wife (who was working there to support herself and child, a support he himself ought to have furnished) and she seeing him first, said to an associate: There is my husband; where will I hide? Being told to hide behind some curtains, she did so, and he not finding her, went down in the elevator, but bent on finding his wife, soon returned, and she thinking him gone had resumed her work. Seeing her there, behind the counter, defendant advanced towards her smiling as he did so and tipping his hat, and speaking to her. He withdrew with her a short distance, she still behind the counter, when an exclamation is heard from that direction, and looking down the aisle, the witness sees defendant's hand come up and hears a shot. At that instant he sees defendant's other hand come up, grab his wife by the shoulder and fire another shot, and as she reels and falls

defendant steps around the counter, bends over it, places the pistol within three feet of the body, fires three more shots into the prostrate and bleeding form, then steps out from behind the counter, walks up the aisle pistol in hand to a witness, to whom he surrenders it, remarking:  "I have killed that wo-man; she is my wife, and you can do with me as you please; hang me if you want to."  Defendant's brutal attack on his wife on the 13th of September, 1898, his threats to besmirch her name so people would turn away from her on the street should she go on with her divorce suit; his threats against her life also made in the same connection; his admission to Allie Ruby Winter that he was about to shoot his wife through the window, but his heart failed him when his little child looked up from the supper table; taken altogether disclose such circumstances of willfullness, deliberation, premeditation and malice aforethought, as are inconsistent with any other crime short of murder in the first degree.

A fouler murder than this never stained the pages of a judicial record!  These remarks and the evidence on which they rest are quite sufficient to show that no instruction looking to murder in the second degree should have been given. If cool deliberation and deadly malice did not characterize defendant's acts, then section 1815 of the Revision of 1899 should be wiped off our statute books, because of defining a crime which has, and can have, no potential existence.

Coming down the scale of instructions we cast our eyes on an instruction for manslaughter in the fourth degree.  This instruction we here preserve; it is as follows:

"If you acquit the defendant of both murder in the first degree and murder in the second degree, but believe and find from the evidence in this cause that the defendant Frank B. Callaway, at the city of St. Louis and State of Missouri, on the tenth day of April, 1899, shot Anna P. Callaway with a pistol loaded with gunpowder and leaden bullets, thereby inflicting a mortal wound upon her; and if you further find from

the evidence that the said Anna P. Callaway did thereafter on the said tenth day of April, 1899, at the said city of St. Louis, die from the effects of such shooting and wounding done by the defendant as aforesaid; and if you further believe and find from the evidence that at the time of such shooting and wounding the defendant Frank B. Callaway, was so far under the influence of passion aroused by any previous conduct of the deceased towards the defendant or others, as to make the defendant incapable of thinking coolly of the natural consequences of his acts, then you should convict the defendant of manslaughter in the fourth degree. You must bear in mind, however, in this connection that it is the passion resulting from the provocation named above, and not the provocation itself, which reduces the grade of the offense from murder to manslaughter. Consequently, although you may believe from the evidence that there may have been the necessary provocation, according to the instructions given you by the court, to produce a passion such as described, still if such provocation did not produce such passion, or having produced it, there was sufficient time for the blood to cool before the shooting and wounding was done, then the offense is not manslaughter, but murder. Whether a provocation such as the above described was or was not given to the defendant by the deceased you must determine from all the facts and circumstances in evidence and if you find from the evidence that such provocation was given, you will then determine whether it produced the passion necessary to reduce the grade of the offense; and if you find that such provocation was given, and that such passion existed therefrom, and that in the heat of such passion the shooting and wounding was done by the defendant, you should convict the defendant of manslaughter in the fourth degree, unless you acquit him on the ground that he was insane at the time, as hereinafter explained."

We preserve this instruction in order to condemn it.

Whether it be the language in which it is couched or the circumstances in which it was given, it is incurably erroneous. It says if defendant "was so far under the influence of passion aroused by any previous conduct of the deceased towards the defendant or others, as to make the defendant incapable of thinking coolly of the natural consequences of his acts, then you should convict the defendant of manslaughter in the fourth degree."

Under this instruction, "any previous conduct of the deceased towards the defendant and others," no matter what it was, the refusal to dismiss her divorce suit against him, the writing of a note years before to a gentleman in Fredericktown, the going out walking the year before with Cooper or with Duke at her husband's instance, or the hiring herself out to Seigel-Hillman in order to earn a meager support for herself and little one; any such item of conduct would amount to such "provocation" as would be sufficient to *raise* defendant's venous and arterial circulation to the point of *"hot blood,"* while it *lowered* his crime to the lowest degree of manslaughter. Aside from that, there was no evidence whatever of provocation such as the books speak of. The defendant himself admitted to MacDonald in December, 1898, that there was "nothing criminally wrong with his wife," and there is nothing in this record to show or even faintly indicate that there was.

There are cases of course where a husband surprises his wife in the very act of adultery and slays her or her lover or both of them, and this is accounted homicide in hot blood. And there is another class of cases where there are cogent and pregnant circumstances showing with convincing force that the wife has but just quitted the arms of her paramour, and her lips are yet warm with his kisses; and in that kind of case it is considered by modern authorities that such circumstances are capable of generating heat of passion and thus lowering the grade of homicide, but nothing less than this has ever sufficed

to reach such a blood-heating and crime-lowering result [State v. Holme, 54 Mo. 153; 2 Bishop, New Crim. Law, secs. 708, 728.]

And in this case even if there had been abundant evidence of provocation, such as the law recognizes as sufficient for the purpose aforesaid, yet there is not a scintilla of evidence to show that defendant acted in the heat of passion.    His every act and motion showed no symptom or indication of hot blood; and when this is the case, the fact that provocation exists is wholly immaterial, unless it actually causes hot blood.    In other words, there must be a *conjunction both of provocation. such as the law recognizes, and of hot blood* before the crime committed becomes lowered to manslaughter.    [1 McClain, Crim. Law, secs. 339 and 342.]

In this case then there was neither provocation nor hot blood, and therefore no basis on which to predicate an instruction such as is now under review.    The court, therefore, should either have refused to admit in evidence such things as to defendant being jealous, etc., etc., or else when seeing the full nature and worthlessness of such evidence, should, on its own motion, have excluded it from the consideration of the jury.

The same line of remark is applicable to the so-called evidence about insanity or mental irresponsibility; and no instruction on that subject should have been given.    [State v. Ward, 74 Mo. loc. cit. 257.]    And it is well enough to remark just here, that we do not understand the meaning of the term *"mental irresponsibility."* It must be a recent importation into the criminal law.    If it means "insanity," why not use that term?

Evidence to show the brutal assault, beating and kicking of his wife by defendant was entirely competent as showing his animus towards her; more especially so as the evidence of threats plainly showed a continuation of that animus down to the time of the murder.    And for the same reason evidence was admissible that the wife was compelled to bring a suit for

divorce against the defendant.     [Wharton's Crim. Evid. (5 Ed.), secs. 785, 786 and cas. cit.]

Anything tending to show want of affection, whether on the part of one or both of the parties is competent on the ground of disclosing motive, and this is especially true where want of affection is thus disclosed on the part of the accused. The letters of defendant to Horton, were therefore admissible on three grounds.

First, showing want of affection on his part towards his wife by writing of her in the way he did, and by threatening to sue her for divorce; second, by showing improper relations with other women; third, evidence of the latter character was also admissible as showing a motive for making away with his wife.     [State v. Duestrow, 137 Mo. loc. cit. 86.]

Finally, the charge is made in the motion for a new trial that the court interferred with counsel for defendant by refusing to allow his counsel to conduct his cross-examination of the State's witnesses, intimidating said counsel by threats of fine and imprisonment.    We find nothing of that kind in the record, and such allegations in motions do not prove themselves.    As showing the frivolous character of objections raised *ad nauseam* by the counsel for defendant during the trial of this cause, we select the following excerpts:

"Q.   By Mr. Eggers:   Well, what occurred?   Do you know if anything occurred?   Objected to as leading, incompetent and immaterial."

"Q.   By Mr. Eggers:   13th of September, of what year?   A.   Of '98.   Q.   Well, what happened then?   Objected to as leading, incompetent, immaterial and calling for a conclusion.   *Objection sustained.*"

"Q.   ·Can you tell the condition of your sister after he struck her?   Objected to as leading."

The lower court displayed throughout this vexatious conduct of this cause by counsel for defendant, the utmost patience and forbearance, and the only wonder one feels on read-

ing this record, is that a little wholesome severity was not exercised towards them.

We have thus carefully gone through with the record in this cause, and finding no error prejudicial to the defendant, we affirm the judgment and direct the sentence pronounced by the law to be carried into execution.     All concur.     ·