THE STATE v. JOHN L. JONES, Appellant.

**In Banc, March 28, 1913.**

1. **EVIDENCE: Murder of Hackman: Conspiracy of Defendant and Strikers.** A strike was in progress at railroad car shops, and defendant was one of the strikers and a "picket." The foreman, a brother-in-law of deceased, had refused to go on strike, and was accosted by some of the strikers and threatened as he returned to his residence at noon on the day preceding the killing. He telephoned for the sheriff, who came in a carriage driven by a half-brother of deceased, and took him to the shops. There was testimony that defendant was on the porch of a store that adjoined the foreman's residence, with other strikers, at the time the sheriff arrived, but none that he said or did anything at that time, or that there was any conspiracy between him and the other strikers to assault the foreman or the cab driver. The next day deceased was at the station with his cabs, and defendant approached and asked deceased who had hauled the foreman the day before, and deceased replied he did not know and asked defendant why he wished to know, to which defendant replied that the foreman had drawn a gun on a boy out at the shops the day before and a warrant had been sworn out for his arrest and he wanted to know how they had got along with him. Deceased asked why the foreman had drawn the gun, to which defendant replied that "we ain't putting out a thing, especially to you fellows, you hack drivers." About that time the horses hitched to one of the cabs became frightened, and, according to the State's evidence, deceased turned to stop them, and de-

fendant followed and stabbed him with a knife, instantly
killing him, and, according to defendant's testimony, deceased
struck defendant with his fist and reached down for a brick,
whereupon defendant stabbed him. *Held*, that the testimony
of the attempted mobbing of the foreman at his residence
the preceding day was improper and its admission constituted
error, there being no evidence that defendant took any part
in it; but it was proper to permit the State to show that
a strike had been declared, that defendant was one of the
strikers and had acted as a picket, and that one of the cab
drivers, present at the place of the homicide, had hauled
the foreman, a brother-in-law of deceased—all for the purpose
of proving malice.

2. ————: **Motive: When Important.** Motive is a vital matter
where the identity of the person who committed the crime
is in doubt, and where defendant claims that his unlawful
act was the result of an accident; but it is not so important
when defendant admits he did the killing, and relies upon self-
defense.

3. ————: **Defendant: Belief Life Was in Danger: Self-serving.**
Where the court instructs the jury that if defendant "did
believe" his life was in danger, etc., it was error to refuse
to permit him to testify that he thought his life was in danger
at the time he killed deceased. Such evidence may be self-
serving, but if it is proper to include in the instruction the
words that defendant "had reasonable cause to believe, *and
did believe*, his life was in danger," he is most likely to know
the condition of his own mind, and should be permitted to
testify he did so believe, though the jury is under no obligation
to believe his testimony unless it and the other facts establish a
reasonable ground for the apprehension.

4. **REMARKS OF PROSECUTOR: Defendant as Horse Thief:
Invited by Counsel.** Where defendant's counsel in his opening
statement to the jury referred to the fact that defendant,
on trial for murder, had been convicted of stealing a horse,
it was not reversible error for the special prosecutor to there-
after refer to defendant as a horse thief. If error, it was
invited by defendant.

5. ————: **Defendant as Murderer.** Where defendant's counsel
fails to except to the refusal of the court to rebuke the prose-
cutor for stating he hoped this is not the day when juries
begin to compromise with horse thieves and murderers, there
was no reversible error in the reference to him as a murderer,
since there was evidence tending to prove that defendant had
killed deceased without provocation. But such arguments are
not to be commended.

249 Mo.—6

State v. Jones.

6. ————: **Request to Convict Defendant Because Previously Convicted of Other Crime.** But an appeal to the jury to convict defendant óf the charge of murder because he has previously been convicted of horse-stealing is error. Where the court has properly instructed that defendant's former conviction of another crime can be considered only as affecting his credibility, it is the duty both of the jury and of counsel in their arguments to obey that instruction. [Overruling State v. Boyd, 178 Mo. l. c. 19, so far as conflicting.]

7. **EVIDENCE: Explaining Former Conviction.** Defendant on trial for murder should not be permitted to testify to facts in mitigation of the crime of horse-stealing of which he has previously been convicted; but it is proper to permit him to show that he has obeyed the law since his release from the penitentiary up to the time of the homicide.

8. **FAIR TRIAL: Misconduct of Special Counsel.** The defendant, because the deliberate misconduct of special counsel employed to assist the prosecuting attorney by repeating their objections and persistently arguing their views after the court had made its rulings, created such confusion as made it well nigh impossible for the jury to understand the evidence, did not obtain a fair trial.

Appeal from Pettis Circuit Court.—*Hon. H. B. Shain*, Judge.

REVERSED AND REMANDED.

*Claude Wilkerson* and *W. G. Lynch* for appellant.

(1) The court erred in admitting evidence of the Vinson trouble. Defendant had no connection with it, and was not present when it occurred. Deceased had no connection with it and was not present when it occurred. It bore no relation to the crime, and was not relevant to the issues involved. The admission of such evidence tended to confuse the issues, distract the mind of the jury and inject in their minds a prejudice against the accused that deprived him of a fair and impartial trial. State v. Jackson, 95 Mo. 649; State v. Faulkner, 175 Mo. 579; Bank v. Murdock, 62 Mo. 70; State v. Martin, 74 Mo. 547; State v. Clayton, 100 Mo. 520; State v. Tabor, 95 Mo. 590; State v.

Parker, 96 Mo. 388; State v. Thomas, 99 Mo. 257; State v. Nelson, 166 Mo. 191; State v. Keuhner, 93 Mo. 196; State v. Swain, 68 Mo. 605; State v. Harris, 73 Mo. 288; State v. Elkins, 63 Mo. 159; State v. Turner, 76 Mo. 350. The State should not have been per- mitted to show that it became necessary for Vinson to call the sheriff to protect him or that it was neces- sary for the sheriff to go to his rescue. The defend- ant should not be held responsible for the acts and words of others, or have his own rights prejudiced or imperiled because others did wrong. State v. Faulk- ner, 175 Mo. 579. (2) The State should not have been permitted to show the strike conditions; that violence was being committed and that pickets were employed by the strikers; that the railroad employed guards to protect men working from the violence of the strikers; and that a sort of miniature warfare was being con- ducted. Such evidence was obviously irrelevant and prejudicial to the rights of the accused. Cases supra. (3) The State should not have been permitted to show who hauled Vinson the day before the tragedy. Cases supra; State v. Tabor, 95 Mo. 591. (4) It will be noted upon an examination of the bill of exceptions that not once did the court rebuke or reprimand the attorneys for the State on account of objectionable re- marks made by them; that the jury was never ex- cluded from the court room while they were being made; and that the remarks objected to were not legal arguments addressed to a point of law, but were either personal abuse of witnesses on the stand, unjust comments on their character or testimony or with ref- erence to matters which were not being investigated, but would greatly prejudice the accused. The remarks evidenced a premeditated and well-contrived campaign of abuse and slander, having for its aim and object the prejudicing of the jury, against defendant. They were harmful and prejudicial, and their effect was in no way cured or removed. State v. Spevy, 191 Mo.

112; State v. Woodward, 191 Mo. 635; State v. Todd, 194 Mo. 377; State v. Mills, 199 Mo. 530; State v. Ferguson, 152 Mo. 92; State v. Hubbard, 149 Mo. 478; State v. Summar, 143 Mo. 220; State v. Punshon, 13 Mo. 44; State v. Johnson, 76 Mo. 121; State v. Griffin, 87 Mo. 608; State v. Kring, 64 Mo. 591; State v. Clapper, 203 Mo. 549; State v. Shipley, 174 Mo. 512; State v. Boyd, 178 Mo. 2; State v. Pageto, 92 Mo. 300; State v. Woolard, 111 Mo. 248; State v. Lee, 66 Mo. 165; State v. Mably, 68 Mo. 315; State v. Reed, 71 Mo. 200; State v. Ulrich, 110 Mo. 350; State v. Young, 99 Mo. 666; State v. Fisher, 124 Mo. 460; State v. Babbot, 131 Mo. 328; State v. Jackson, 95 Mo. 623; State v. Prendible, 165 Mo. 329; State v. Wright, 141 Mo. 333; State v. Jackson, 95 Mo. 623; State v. Gillespie, 104 Mo. 400. (5) The court erred in admitting testimony of the strikers employing pickets and the railroad company employing guards. State v. Thomas, 78 Mo. 343; State v. Nelson, 166 Mo. 203; State v. Faulkner, 175 Mo. 546; State v. Swain, 68 Mo. 605; State v. Spivey, 191 Mo. 112.

*Elliott W. Major,* Attorney-General, and *John M. Dawson,* Assistant Attorney-General, for the State; *Perry S. Rader* of counsel.

(1) The testimony concerning the assault on Vinson by the strikers on the day preceding the homicide, that there was a carmen's strike, and that defendant was a member of the carmen's union, was admissible. The said testimony was a circumstance connected with the crime, and defendant's own testimony connected him with it. Some part of his connection with it was shown by the testimony of Jack Savage, C. O. Schmidt, James Vinson and others. Besides there was a strike, Vinson was a fellow-laborer but not a striker, defendant was both a striker and a picket at the Katy station. He testified himself in chief that he was a member of

the carmen's union and a striker. State v. Bailey,
190 Mo. 258; State v. Meyers, 198 Mo. 260; State
v. Testerman, 68 Mo. 408; State v. Spaugh, 200 Mo.
599; State v. Rudolph, 187 Mo. 83; State v. Earnest,
70 Mo. 520; State v. Tabor, 95 Mo. 585; State v. For-
sythe, 89 Mo. 667; State v. Saunders, 106 Mo. 188;
State v. Hoffman, 78 Mo. 256. It was also competent
as showing motive. State v. Roberts, 201 Mo. 726;
State v. Williamson, 106 Mo. 162; State v. Duestrow,
137 Mo. 86, secs. 5 and 6; State v. Hathhorn, 166 Mo.
229; State v. Evans, 159 Mo. 589. (2) In his argu-
ment to the jury, Mr. McGruder, special counsel for
the State, said: "I hope this seventeenth day of Jan-
uary is not the day when the juries begin to compro-
mise with horse thieves and murderers." The court
held that the reference to this defendant as a horse
thief was permissible only as affecting his credibility
as a witness, but that it was allowable for that pur-
pose. There was no error in either the attorney's
remark or the court's ruling. The defendant had him-
self testified in chief that he had stolen a horse and
had served a sentence in the penitentiary on a plea of
guilty; and the evidence certainly authorized the State
to speak of him as a murder. State v. Barrington, 198
Mo. 91; State v. Phillips, 160 Mo. 505; State v. Sum-
mar, 143 Mo. 220; State v. Allen, 174 Mo. 689; State
v. Boyd, 178 Mo. 2. (3) The record abounds in use-
less objections and remarks by the State's special
counsel, but of most of them nothing worse can be
said than that they were useless and tended to im-
pede the progress of the trial; and perhaps to fret and
vex both the defendant's counsel and the court. It
will be observed that no exception was saved to the
ruling of the court upon the remarks of Mr. Steele.
Mr. Lynch interposed a very strenuous objection to
those remarks, or "speech" the court calls them, but
when the court, after Mr. Lynch interposed his vigorous
protest, said, "Now, gentlemen, you have both made

your speeches, and the court is going to rule again; I think you are treading on dangerous ground in making these speeches; I have tried as best I could to keep them out," there was no exception saved by appellant. Nor was any further objection made. Nor was any request made that the court reprimand Mr. Steele, or caution the jury. The court ruled that the testimony was competent, and apparently defendant was satisfied with the court's action. He himself injected the horse-stealing incident into the case in his examination in chief. We also frankly admit there were clauses in Mr. Steele's statement that were improper, such as the statement that defendant, in explaining the taking of the horse as a trespass (that "he took the horse and failed to return it"), was coming into court "with this lie in his mouth," and also the statement that "the gentleman is talking about going to the Supreme Court." But Mr. Steele's remarks were not reversible error, for several reasons: (a) There was no exception saved to the court's failure to more vigorously sustain defendant's objection to them. State v. Zorn, 202 Mo. 12; State v. Coleman, 186 Mo. 159; State v. Lamb, 141 Mo. 305; State v. Hilsabeck, 132 Mo. 359; State v. Thurman, 121 Mo. App. 377. (b) It was not improper for the State's counsel to allude to the defendant as a horse thief. Defendant, in his direct testimony, proceeded at once to say he had taken Mr. Brown's horse and had pleaded guilty to stealing it, and prior thereto his counsel, in his opening statement, had said defendant had been sentenced to three years' imprisonment for stealing Brown's horse. It was not prejudicial for the State's counsel to so characterize him. State v. King, 214 Mo. 391; State v. Allen, 174 Mo. 689. (c) A judgment should not be reversed for every transgression by counsel of the legitimate bounds of argument or for improper remarks during the progress of the trial; to warrant a reversal on that ground, the court must

be satisfied that the improper remarks were preju-
dicial to defendant, and had some influence with the
jury in arriving at their verdict. State v. Sublett, 191
Mo. 174; State v. Emery, 76 Mo. 348. (4) Exceptions
to the remarks of counsel must be made at the time
the, remarks were made. State v. Volle,. 196 Mo. 29;
State v. Chenault, 212 Mo. 137; State v. McCarver,
194 Mo. 740; State v. Armstrong, 167 Mo. 257; State
v. Scullin, 185 Mo. 709; State v. Grace, 230 Mo. 702;
State v. Thavanot, 225 Mo. 546; State v. Foley, 220
Mo. 89; State v. Murphy, 201 Mo. 696. (5) No re-
marks were made by the State's counsel, either in
the progress of the trial or in their argument to the
jury, that would justify the Supreme. Court in order-
ing a new trial, and for several reasons: (a) Where
the remarks were improper and defendant raised a
proper objection, the court in most cases sustained
that objection. (b) Where the remarks were im-
proper, if indeed there were any such, and defendant's
counsel made a proper objection which the court re-
fused to sustain, no exception was saved to the court's
ruling, and therefore those remarks cannot be consid-
ered on appeal. State v. Pegels, 92 Mo. 311; Sec.
2081, R. S. 1909. (c) The court sustained objections
to most of the damaging remarks made by the State's
counsel, and therefore of them the appellant cannot
complain. (d) Where objections to remarks of coun-
sel were made, they were often insufficient to justify
a ruling. An objection that the remarks are prejudi-
cial is alone the same as no objection at all. State v.
Young, 153 Mo. 445. (e) Oral remarks by the trial
judge during the progress of the trial must be ob-
jected to at the time. State v. Dewitt, 152 Mo. 76. (f)
The burden is on appellant to show that the remarks
of the State's attorneys during the progress of the
trial were prejudicial. State v. Edie, 147 Mo. 535;
State v. Hibler, 149 Mo. 478. (g) The statement of a
truth is not an improper remark. State v. Summar,

143 Mo. 220; State v. Griffin, 87 Mo. 615. (6) The testimony concerning the Vinson trouble was competent as explaining the conversation of defendant at the station at the time of the homicide. No stronger authority on this point could be cited than the case of State v. Nelson, 166 Mo. 191, cited by defendant, and especially what is between pages 196 and 202, inclusive. (a) The testimony was competent as a circumstance closely connected with the homicide, and as going to establish one of the constitutive elements of the offense. State v. Dettmer, 124 Mo. 432; State v. Rasco, 239 Mo. 562; State v. Ferrell, 233 Mo. 452; State v. Boyer, 232 Mo. 267; Wharton on Crim. Ev. (9 Ed.), sec. 48; Underhill on Evidence, sec. 58; People v. Molineux, 168 N. Y. 293; State v. Bailey, 190 Mo. 280. "This evidence constituted a part of the history of the transaction." State v. Collins, 181 Mo. 259; State v. Nugent, 71 Mo. 143. (b) It was competent to prove motive. State v. Lehman, 175 Mo. 619; State v. Hyde, 234 Mo. 237. (c) If the testimony concerning the Vinson matter was not competent as tending to show motive or as a fact or circumstance tending to establish one of the constitutive elements of the homicide, or as a part of the history of the transaction and explanatory of it, then how could its admission be prejudical to defendant? The fact that there had been trouble between Campbell and Vinson the day before the homicide, and that the sheriff had come in Jack Savage's carriage and taken Vinson down town, could not have prejudiced defendant in the minds of the jury. How could they have been influenced a hair's breadth by those facts? On that theory the incident at its worst was a mere immaterial and irrelevant matter, and did not endanger a fair and impartial trial, and in such case the judgment will not be reversed. State v. Cummings, 189 Mo. 643; State v. Kretschmar, 232 Mo. 48. (7) It was not error to permit the State to show that there was a strike, that defendant was a

picket, and that the railroad employed guards to pro-
tect men who were working for the railroad. ·De-
fendant objected to the relevancy of the Vinson trou-
ble, but he did not object to what had been said about
the strikers. Both sides seemed to assume that the
strike was in some way connected with the homicide,
and testimony concerning it was proper, and no effort
was made to keep from the jury the fact that there was
a strike, or that the railway company had guards at
the station to protect the men who had taken the place
of the strikers or that there were strikers at the store
when the sheriff went there to taken Vinson down
town.

BROWN, J.—Defendant stands convicted of stab-
bing and killing one Milton Akins Mackey in Pettis
county on November 20, 1911, and from a judgment
of the circuit court of that county fixing his punish-
ment at death he appeals.

A very fair outline of the case made by the State
will be obtained by quoting the salient parts of the
evidence of witness Charles L. Hollingsworth, who
ꞏtestified as follows:

"A. They was at the Katy depot, and we was all
standing there talking, and Mr. Jones came up, and
he didn't speak to Mr. Mackey, but he was looking
right at Mr. Mackey, and asked Mr. Mackey: 'Who
hauled this man, Vinson, the day before?' And Mr.
Mackey replied, he said he didn't know. Mr. Mackey
.wanted to know then why he wanted to know. 'Why,'
he says, 'he drawed a gun on a boy at the shops and
they swore out a warrant for him,' and he wanted
to know how they got along with him.' Mr. Mackey
asked Mr. Jones: 'What made him draw this gun?'
Mr. Jones wouldn't tell him; says: 'We ain't putting
out a thing' he says, 'specially to you fellows'—you
hack drivers or something like that. That's the words
he said, and then Mr. Mackey's team got scared and

started to run, and Mr. Mackey run after the team and Mr. Jones run in and stabbed him.

"Q. How far did Mr. Mackey have to run to get to his team from where he was standing? A. About twelve or thirteen feet.

"Q. When he was running to get his team was he running towards or away from the defendant, Jones? A. He was running away from him.

"Q. And just state what Mr. Mackey did when he reached where his team was? A. He grabbed the lines.

"Q. Now, how were the lines fixed, Charley, so the jury will understand? A. They was wrapped around the hub of the wheel, and Mr. Mackey run up to grab the lines, and put his left hand on top of the wheel and his right hand ahold of the lines."

Hollingsworth further testified that Jones looked like he was mad and held his right hand in his front pants pocket when he first came down where the hacks were standing. That immediately after the stabbing took place Jones's hat was on the ground, but witness did not know how it came to be there. Hollingsworth further testified that after Mackey was stabbed and fell he (Hollingsworth) and others started towards Mackey's body, whereupon Jones slashed at them with his knife.

The evidence of witness Hollingsworth was strongly corroborated by five other witnesses for the State. These witnesses were standing from ten to fifteen feet from Mackey and Jones, but did not hear any quarrel, nor see any hostile demonstration on the part of Mackey whatever. One witness for the defendant who was present at the tragedy testified that while Mackey struck defendant before the stabbing took place the defendant was not knocked down.

Defendant's account of the killing is as follows:

"Q. What conversation occurred there in the presence of Mr. Mackey, Mr. Jones?

"The Court: That conversation has been gone into.

"A. Well, I asked the question: If any of them knew whether or not Sheriff Henderson had got back to town with Mr. Vinson. And this man, Mr. Mackey, says: 'I don't know. Why?' 'Well,' I says, 'I heard this morning there had been a warrant sworn out for him and the sheriff had went after him.' And Mackey says: 'What in the hell do you know about it?' I says: 'I don't know anything about it.' I wasn't supposed to know because I wasn't there. 'Well,' he says, 'what was the warrant sworn out for?' I says: 'I understand Mr. Vinson made a gun-play out at the Katy shops yesterday at noon.' And Mr. Mackey says: 'Are you a carman?' I says: 'Yes, sir.' He says: 'Where is your card?' I says: 'I have none.' I says: 'I have nothing but my receipts to show I have paid my dues.' Red Baldwin says: 'He is a carman all right.' And Mr. Mackey was standing on the foot step of the Terry van when I was talking to him, and he stepped off onto the sidewalk.

"Q. In which direction? A. Why, he stepped off south from where he was standing, and stopped southeast of me. I was standing near the edge of the curbing. And he says: 'You may have to know something about it.' 'Well,' I says, 'I ain't putting out anything to-day.' I told him: 'That's all right,' and I made a step or two backwards, and went to turn. Mr. Mackey says: 'You son-of-a-bitch,' and he hit me right behind the ear (indicating), and knocked me off the curb into the street.

"Q. Now, then, what happened, Mr. Jones? A. He followed me up and hit me right along back there (indicating) and knocked me to my knees, and as I straightened up, I turned facing the south, and Mr. Mackey hit me one lick right over my heart, and knocked me down (indicating), and I went flat and he made a rush towards the front wheel of the second

rig from the east. It was a carriage. And he reached down below the hub of the wheel towards a brick-bat that was laying there, and I thought my life was in danger—

"Mr. Steele (interrupting): We object to that, and ask that it be stricken out.

"The Court: Objection sustained. Strike out what he thought.

"To which action and ruling of the court in sustaining said objection and in granting said motion to strike out, the defendant then and there duly excepted at the time and still excepts.

"Q. Then what occurred? A. When I got on my knees, I took my knife out of my right-hand pants pocket, and opened it while I was on my knees, and grabbed Mr. Mackey by the overcoat and pulled myself up, and he straightened up. He saw the knife and throwed his right hand down in his overcoat pocket, and I struck him with the knife. (Indicating all the time.)

"Q. How many times did you strike him with the knife? A. I don't know."

Defendant was corroborated by one witness and partially corroborated by two others. One witness called by the State, who was standing about sixty feet from the parties, testified that immediately before the stabbing he heard Mackey say to defendant: "You are a damn liar, you will do nothing."

Mackey was killed with a pocketknife, the blade of which was about three inches long.

As we find the judgment must be reversed for errors hereafter noted, it is unnecessary to give a more detailed statement of the evidence. It is sufficient to say that the testimony on the part of the State, if true, is sufficient to sustain the verdict of the jury imposing the death penalty upon defendant; while the evidence on the part of defendant, if true, would have justified the jury in finding a verdict of murder in

the second degree, or manslaughter in the fourth degree.

## OPINION.

I.   On the part of the State the evidence tended to prove that many of the employees of the car shops of the Missouri, Kansas & Texas Railroad Company at Sedalia had been on a strike for about a month before Mackey was killed; that defendant Jones was one of the strikers and had performed "picket work" for them.   The trial court permitted the State to introduce evidence tending to prove that on the day before Mackey was killed about twenty-five of the strikers attempted to assault and mob one Vinson, a brother-in-law of Mackey.   That said Vinson was chased to his residence by said strikers, whereupon the sheriff of Pettis county engaged one Jack Savage, a half brother of Mackey, to go with him and haul Vinson from his residence to the car shops.   Vinson had been working at the railroad car shops with the strikers, but had refused to join the strike.   Mackey operated a hack and it does not appear that he had any interest in the strike.

*Evidence of Another Crime.*

Defendant objected to the testimony relating to the attempted mobbing of Vinson on the ground that it tended to prejudice the minds of the jury by placing before them evidence of another crime with which defendant was not connected.   The prosecution promised to connect defendant with the mobbing of Vinson, whereupon the court admitted the evidence. ·

Jack Savage, one of the witnesses for the State, testified that he saw defendant standing on the steps of a near-by grocery store when he and the sheriff arrived at Vinson's house, but there was no evidence that defendant took any part in the attempted assault on Vinson.   We find that the evidence of this attempted mobbing of Vinson was improper and its ad-

mission constituted error. [State v. Spray, 174 Mo.
569; State v. Boatright, 182 Mo. l. c. 51; State v.
Teeter, 239 Mo. 475, l. c. 485; Constitution of Missouri,
article 2, section 22.]

Even if it had been shown that defendant took
part in the attempted mobbing of Vinson, that would
not tend to show malice on the part of the defendant to-
wards Mackey who was engaged in a different occu-
pation than Vinson and was apparently not connected
with the strike. The case of State v. Bailey, 190 Mo.
l. c. 279, cited by the Attorney-General, is not in point
because it was not proved that the parties who tried
to mob Vinson were acting in concert with defendant.
There is nothing in the record tending to prove that
any other striker had agreed or undertaken to co-op-
erate with defendant in assaulting Mackey or other
hackmen.

Strikes do frequently result in rioting and mur-
der, but we cannot, as a matter of judicial knowledge,
say that all persons who go on a strike are desirous
of committing murder.

The fact that the special prosecutor for the State
promised the trial court to connect Jones with the at-
tempted mobbing of Vinson, but did not do so, con-
vinces us that the evidence of this rioting was intro-
duced for the sole purpose of inflaming the minds of
the jury against defendant. This was highly im-
proper.

The human mind is so constituted that when it
becomes prejudiced against an individual it cannot im-
partially weigh evidence tending to show his guilt or
innocence—prejudice and malice dethrone reason, and
overcome the natural impulse of both juries and courts
to weigh evidence and decide disputed facts correctly
and impartially.

Upon a retrial of the case the State should be per-
mitted to show that a strike had been declared by the
employees of the car shops; that defendant was one

of the strikers and had acted as a picket. Also that one of the hackdrivers present at the place where the killing occurred had hauled Vinson, a brother-in-law of Mackey, to the car shops, and all of these enumerated facts for the purpose only and to the extent only of proving malice. No evidence should be admitted of rioting or other acts of lawlessness committed by other strikers than defendant, unless the State can furnish evidence of a conspiracy between such other strikers and defendant to assault Mackey. [State v. Bailey, 190 Mo. 257.]

The following cases may profitably be consulted regarding the admissibility of evidence to prove motive: State v. Page, 212 Mo. 224; State v. Callaway, 154 Mo. 91; State v. Duestrow, 137 Mo. 44.

Motive is a *very* vital matter in cases where the identity of the party who committed the crime is in doubt, and also where defendant claims that his unlawful act was the result of an accident, but it is not so important when, as in this case, the defendant admits that he did the killing and relies upon the plea of self-defense.

II. The defendant further contends that the trial court committed error in striking out that part of his evidence wherein he stated that at **Apprehension of Danger.** the time he stabbed and killed Mackey he believed his life was in danger.

Defendant had, by his plea of not guilty, and by his evidence, tendered the issue of self-defense. The learned trial judge submitted that issue to the jury in the first paragraph of instruction numbered 13, which reads as follows:

"The right to defend one's self against danger not of his own seeking is a right which the law not only concedes but guarantees to all men. The defendant may, therefore, have killed deceased and still be innocent of any offense against the law. If at the time

he stabbed deceased he had reasonable cause to apprehend on the part of deceased a design to do him some great personal injury, and there was reasonable cause for him to apprehend immediate danger of such design being accomplished, and to avert such apprehended danger he stabbed, and at the time he did so he had reasonable cause to believe, *and did believe,* it necessary to use his knife in the way he did, to protect himself from such apprehended danger, then and in that case the stabbing was not felonious, but was justifiable, and you ought to acquit him upon the ground of necessary self-defense. It is not necessary to this defense that the danger should have been actual or real, or that danger should have been impending and immediately about to fall. All that is necessary is that defendant had reasonable cause to believe *and did believe* these facts. But before you acquit on the ground of self-defense, you ought to believe that defendant's cause of apprehension was reasonable. Whether the facts constituting such reasonable cause have been established by the evidence you are to determine, and unless the facts constituting such reasonable cause have been established by the evidence in the cause, you cannot acquit in such case on the ground of self-defense, even though you may believe the defendant thought he was in danger.''

In view of the foregoing instruction we hold that it was error to strike out that part of defendant's evidence tending to show the condition of his mind and his belief of impending danger from deceased at the time he did the stabbing. Such was the ruling of Division No. Two of this court in the recent case of State v. Turner, 246 Mo. 598, l. c. 616, 617.

In the mind of the writer it is only a matter of common sense to hold that when under the law as declared by the court a defendant is required to convince the jury that his mind was in a certain condition at the time he assaulted or killed another person, in order

to escape the ordinary consequences of his act, it is error to refuse to allow such defendant to testify as to the condition of his mind and his apprehension of danger at the time of such assault or killing.

It may be said that the evidence of defendant under such circumstances would amount to only a self-serving statement. Be that as it may; the defendant is the man most likely to know the condition of his own mind, and the jury is under no obligation to believe him unless upon his cross-examination and upon a consideration of all the facts in the case his evidence as to his apprehension of danger is so reasonable and consistent that the jury is convinced he has testified truthfully.

Whether error of this character is sufficient to work a reversal of a judgment must depend somewhat upon the other facts in the case in which it is committed.

III.   It is also asserted by defendant that the judgment below should be reversed because one of the special prosecutors, while defendant was giving his evidence, frequently referred to him Remarks of · as a horse thief. This grew out of the Prosecutor. fact that defendant's attorney in his opening statement to the jury admitted that the defendant had been convicted of stealing a horse. If defendant's attorney had not undertaken the unusual, and, perhaps, unwise course of discrediting the testimony of his client before the latter was sworn, the alleged error complained of would probably not have occurred. If there was any error in the language used by the assistant prosecutor at the time the defendant was testifying, such error was, in a large measure, self-invited and would not justify a reversal.

The trial of defendant was concluded on the 17th day of January, 1912, and one of the special prosecut-

State v. Jones.

ors for the State in his argument to the jury said: "I hope this 17th day of January is not the day when the juries begin to compromise with horse thieves and murderers." This argument was objected to by defendant and is assigned as ground for reversal. The court told the jury, orally and also by instructions, that they should only consider the prior conviction of defendant as tending to discredit his evidence as a witness. The defendant failed to except to the action of the court in neglecting to rebuke the special counsel for the above mentioned argument, and we would not notice it here, except for the reason that the matter may come up again upon a second trial of the case. As there was evidence tending to prove that defendant killed Mackey without provocation, it was not reversible error to call him a murderer. [State v. Allen, 174 Mo. 689; State v. Summar, 143 Mo. 220.] However, such arguments are not to be commended. Epithets weaken any argument, wherever used, whether in court or out of it. The use of epithets and extravagant language sometimes inflames the minds of inconsiderate people, but in reality such language indicates that the speaker is short on facts upon which to support a real argument.

Another point of objection to the remarks of the special prosecutor is that they amounted to an appeal to the jury to convict defendant of murder because he had previously been convicted of horse-stealing. This insistence is not without merit. The trial court had instructed the jury that defendant's conviction of horse-stealing was not evidence that he had murdered Mackey; consequently, the above quoted argument was directly in face of the law as correctly declared by the court. It is never proper for attorneys to directly or indirectly invite juries to disregard or disobey the written instructions of the court.

The laws of the State of Texas, like our own, provide that evidence of the former conviction of a de-

State v. Jones.

fendant can be introduced for the purpose of discrediting his evidence. In the recent case of Taylor v. State, 50 Tex. Cr. R. 560, l. c. 561, 100 S. W. 392, the county attorney made the following statement:

" 'The only punishment you can give this negro bully is to end his earthly career. If you send him to the penitentiary, it will not reform him. He has been in the penitentiary for assault to murder, and it has had no effect on him. And he goes out the first thing and gets a big six-shooter, and goes to killing. He has been tried in the penitentiary, and that does no good, and you must not give him another chance in the penitentiary, for, if you do, he will watch his opportunity to kill the guards and escape."

In reversing the judgment in that case the Supreme Court of Texas said:

"The language of the county attorney in his argument to the jury was highly inflammatory and prejudicial to the rights of appellant, and the court should not only have reprimanded the counsel, but should have charged the jury to totally disregard such argument. . . . The fact of appellant having previously been in the penitentiary was admitted by the court for the sole purpose of testing the credibility of the appellant as a witness in his own behalf. It was legitimately admissible for this purpose, and could not legitimately be used for any other purpose."

To the same effect is the ruling of Division No. Two of this court in the recent case of State v. Phillips, 233 Mo. l. c. 306.

Upon a retrial of the case the prosecuting attorney should be permitted, in commenting specifically upon the evidence of defendant, to refer to the fact that he has been convicted of horse-stealing, as tending to discredit his evidence as a witness in his own behalf, but he should not be allowed to urge his prior conviction as evidence that he committed the crime with which he is now charged.

In so far as the case of State v. Boyd, 178 Mo. 2, l. c. 19, is in conflict with the views herein expressed it is overruled. But it does not appear in what connection the prosecuting attorney in the Boyd case referred to defendant's former conviction, and that case is not necessarily in conflict with this opinion.

This case does not fall within the purview of section 4913, Revised Statutes 1909, under which a former conviction may be charged in the indictment and proved to increase the punishment. [State v. Austin, 113 Mo. 538.]

IV. The defendant while on the stand attempted to testify to facts in mitigation of the crime of horse-stealing of which he had previously been convicted. We do not think he should be allowed to do so. If a defendant may impeach or partially impeach a judgment of conviction, then it would undoubtedly be permissible for the State to introduce other witnesses to prove that there were no mitigating circumstances connected with the former conviction, and thus a trial court would, to a large extent, have to re-try the former case. Such a procedure would be very confusing and unsatisfactory. If defendant can show that he obeyed the law and lived the life of a good citizen after being released from the penitentiary up to the time the present charge was preferred against him he should be permitted to do so.

*Impeaching Judgment, etc.*

V. A careful reading of the record in this cause convinces us that the learned trial judge was, at all times, desirous of according the defendant a fair trial according to the forms of law, but we are further convinced that defendant did not obtain a fair trial on account of what appears to have been the deliberate misconduct of the special counsel employed to assist the prosecuting attorney.

*Necessity of a Fair Trial.*

The special counsel employed to assist the prosecuting attorney, as well as defendant's attorneys, by repeating their objections to the evidence, and by persisting in arguing their views after the court had ruled against them, created such a state of confusion that it must have been well nigh impossible for the jury to have understood the evidence which was admitted. Upon a retrial of the cause the circuit court should require the attorneys to refrain from personal abuse of each other, to make their exceptions to evidence in a concise form, and compel them to abide all rulings of the court when made, even if to accomplish these results he should find it necessary to punish them for contempt.

The defendant complains of other alleged errors, but, if errors, they are of such a nature that they are not likely to reoccur upon a second trial of the cause. Therefore, we will not incumber this opinion with them.

The real object in creating and maintaining courts is to accord litigants fair trials. The greater the punishment sought to be inflicted upon a defendant, the greater the necessity that his trial should be in accordance with the forms prescribed by law. As the defendant was not given a fair trial we will reverse the judgment and remand the cause for a new trial in accordance with the views herein expressed. It is so ordered.

*Faris, J.,* concurs; *Graves, Walker* and *Woodson, JJ.,* concur in separate opinion filed by *Graves, J.; Bond, J.,* concurs in result; *Lamm, C. J.,* not sitting.

## CONCURRING OPINION.

GRAVES, J.—I fully concur in the result reached in the principal opinion, and in most of the opinion. There are, however, some things in which I do not concur. In the last sentence of paragraph two of the

opinion it is said: ''Whether error of this character is sufficient to work a reversal of a judgment must depend somewhat upon the other facts in the case in which it is committed.'' This language is too broad. If there are any facts in the case tending to show that the defendant acted in self-defense, it is absolute and reversible error to refuse such defendant the right to testify to what he believed his situation to be when he struck the fatal blow, and this, too, irrespective of any other facts in the case. The only prerequisite for the exercise of this right by the defendant, should be, that self-defense was invoked, and that there should be in evidence some facts tending to establish such defense. For these reasons I think the concluding remarks under his paragraph two is a little broad, and not hedged with proper limiting words.

As to the third paragraph of the opinion I only wish to say that in my view of the law the language used by, and the conduct of, the special prosecutor in this case, are of themselves sufficient to work a reversal of this judgment. It strikes me that my brother does not go quite so far, but it may be that he does. At any rate this will make my position clear. With these exceptions I concur fully in the opinion and fully concur in the result thereof. *Woodson* and *Walker, JJ.,* concur in these views.