STATE of Missouri, Respondent,

v.

Leslie (Jack) HENDERSON, Appellant.

No. 45789.

Supreme Court of Missouri,
Division No. 1.

May 13, 1957.

Charles Farrar, Theo. G. Scott, Buffalo, for appellant.

John M. Dalton, Atty. Gen., Robert T. Donnelly, Sp. Asst. Atty. Gen., for respondent.

HYDE, Judge.

Defendant appeals from conviction of murder in the second degree and sentence of 25 years in the penitentiary. The only question raised is the sufficiency of the evidence to make a case for the jury.

It was admitted that defendant shot Louis Cline (hereinafter referred to as deceased) but it was claimed that the shooting was accidental. The following circumstances concerning the fatal shooting were shown by the State's evidence. Defendant and deceased had been acquainted for about five years, living near each other in Dallas County during that period, and they previously had worked together in the timber, cutting wood. Defendant was crippled and used a crutch. So far as known to their neighbors, including deceased's wife, they were good friends. However, they had not worked together for about three weeks prior to the shooting and deceased had been working in the timber with another neighbor, Lloyd Meyer, during that period. The State had the following evidence of statements made by defendant concerning deceased about a week before the shooting: "Q. Did you there at that time, David, out at Verl Dorman's, out in that neighborhood, hear some statement made by Jack Henderson about Lou Cline? A. Yes. * * * Well, I heard him cussing about the logs, and he said 'That son-of-a-bitch sawed all my wood up and didn't leave me any', and I heard him say he had a notion to tromp his God Damn guts out." This evidence was the testimony of a 14 year old boy who was working for Dorman, a neighbor of defendant and deceased, and he said the statements were made after he went on a trip to town with defendant and Dorman and after defendant had "showed us where the wood was, and there wasn't no wood there."

On the day of the killing, deceased went into the timber, near defendant's home, with his wife and Lloyd Meyer. They went in Meyer's truck and worked through the morning; and at noon Meyer's wife, Betty Meyer, came in Meyer's car with their three small children (one, three and five years old) and brought them dinner. They then all drove back into the timber as far as they could go on the rough trail (to a place where a tree had fallen across it), left the children in the car and began working about 100 yards from the trail. Meyer was operating a circular saw and the others were splitting and piling wood. About 3:30 P. M. defendant drove up to where Meyer's car was, turned his car around and headed it back out. Defendant's wife and baby

(three weeks old) were with him. Defendant walked into the timber about half the distance between the road and the place where they were working and called, "Lou, come here", at the same time making a motion with his head to indicate he wanted him to come to him. Deceased's wife said defendant's call sounded rough. Deceased laid down his axe and went toward defendant who then turned and walked toward the road. Deceased followed him and in a short time, estimated from three to five minutes by deceased's wife and Mr. and Mrs. Meyer, a gunshot was heard from the direction of the road. (They could not see the road from where they were working in the timber.) Deceased's wife said she had not heard any other sounds up on the road prior to the shot and that the next thing she heard was a car start. She then "heard something like it had crashed into something". She later saw defendant's car hung up on a rock 75 yards from Meyer's car and saw her husband crumpled up on the floor in the back of defendant's car. Meyer was running his tree saw when defendant called deceased so he did not hear what he said but saw him motion to deceased by throwing his head back. He stopped the saw and soon heard the shot and heard deceased scream. He then heard the car start from a dead engine and heard a crash on the road. Mrs. Meyer also heard the shot, the scream, the car starting and the crash.

Meyer went to his car and found his children crying and screaming. He then walked toward defendant's car which was 75 yards down the road, hung up on a large rock. Defendant called to him to bring his car and he went back and drove it to defendant's car. Meyer saw deceased slumped down on the floor of defendant's car between the front and rear seats. Meyer asked defendant what happened and he said "I shot Lou." (Defendant never told Meyer the shooting was accidental but he did hear him tell others that later in the afternoon but he did not hear any explanation of how it happened.) Defend-

ant and Meyer took deceased out of defendant's car with the intention of putting him in Meyer's car and taking him to a doctor but he was too heavy (deceased was five feet two inches tall and weighed 210 lbs.), so Meyer went to call a doctor leaving him on the ground by defendant's car; he was dead when the doctor arrived. Defendant's car was a 1941 Chevrolet with two doors. It had a two piece windshield, with a strip up through the middle, and the right side of the windshield was broken out. Meyer did not see defendant's wife any place around there and defendant did not say anything about her being there. However, after he had a neighbor make a phone call for the doctor and was waiting at the highway for him, he saw defendant's wife come out of the timber with her baby. She had a scratch on one side of her head which was bleeding. She told him what had happened and went toward home. She did not testify at the trial.

The doctor arrived about fifteen minutes after Meyer had the call made; the sheriff and the coroner came soon afterwards. The sheriff and coroner determined from defendant's breath that he had been drinking but was not then intoxicated. Defendant told the coroner that he drank two bottles of beer. Defendant also told the coroner that deceased was on the front bumper of his car and the gun was lying across his lap. He said it was an accident but said he didn't know where the shot went out of the car. Defendant also told the sheriff that deceased was standing on the bumper of his car and the gun was laying on his lap. He said "he hit a rock and the gun was discharged." The sheriff said defendant once said the gun shot out through the windshield and "then he said he wasn't for sure, it might have shot out the side of the door." The sheriff found two blood stains on the side of defendant's car just behind the door on the driver's side; one was a two or three inch spot and the other was smaller. Deceased's wound was made by a deer slug, a flat piece of lead, weighing about one ounce, in his left front chest near

the center of the breast. The slug and three pieces of cotton wadding penetrated his breast. The sheriff found the empty deer slug cartridge in the gun and two cartridges with number four shot in the magazine. The slug took a downward course of ten to fifteen degrees which the doctor said might be the effect obtained if a five foot two man was shot by a five foot eight or nine man (defendant's height) when both were standing on the ground. There was conflicting evidence concerning the presence of glass particles on the clothing of deceased. The State also had evidence of a State Highway Patrolman of laboratory examinations of deceased's clothing showing powder burns and firing patterns of the gun used by defendant. From these tests, this witness said that the powder burn pattern on deceased's clothing showed that the shot was fired from a distance of less than three feet. He also said, if the shot went through the windshield, the only way possible to have gotten the powder pattern found on deceased's overalls would have been to have put the muzzle of the shotgun in actual contact with the glass; and that at any distance behind the glass the powder burn would be much less than it was.

Defendant's version of the casualty, as summarized in his brief, was as follows: "On the day in question he was going down in the woods to see Lou Cline about some logs and took his wife and baby with him, all riding in the front seat. That he parked his car and walked a short way down in the timber and called Lou Cline to come up to where he was and they talked about some saw logs; that Lou Cline got on the bumper and they started driving back up the trail to see about the logs and were going to shoot some quail if they were still up the road (where defendant had seen them on the way in); the defendant had a shotgun and the stock was in his lap and the barrel on his wife's knee, but as they drove up the road the barrel slipped off her knee and he reached down and started to put it over in the back seat and some way

he hit something and the gun discharged and shot the right front windshield out and hit Mr. Cline. The defendant had stopped the car and when he got out he found Lou Cline down on his knees and the defendant got ahold of Mr. Cline's arm and helped him into the back of the car and started to Buffalo to a doctor, but after he started the car up again he just went a short distance and hit a big rock and could not move the car. Mr. Meyer then came up and by that time Mr. Cline was in bad shape and they took him out of the car to put him in the Meyer car and then decided not to do so. That at the time the car hit the rock the defendant's wife, who was in the front seat, was thrown forward and got a slight cut from the jagged glass left in the windshield. That the relationship between the defendant and Lou Cline was good; that defendant considered Lou Cline as the best friend he had and they had worked together for five years."

█ Defendant's contention is that the evidence shows nothing more than suspicion and is insufficient to sustain a conviction, citing State v. Wheaton, Mo.Sup., 221 S.W. 26; State v. Shields, 332 Mo. 280, 58 S.W.2d 297; State v. Davis, 337 Mo. 404, 84 S.W.2d 633. Defendant also says when the defense to a murder charge is accident, motive is very vital and none was shown, citing State v. Jones, 249 Mo. 80, 155 S.W. 33. "Motive is not an essential element of the crime of murder, or of any other crime, except to the extent that it is made so by statute." 26 Am.Jur. 180, Sec. 36; see also 26 Am.Jur. 478, Sec. 465; 41 C.J.S. Homicide § 318, p. 31; 14 Am. Jur. 786, Sec. 27; 22 C.J.S. Criminal Law § 31, p. 88; State v. Taylor, 356 Mo. 1216, 205 S.W.2d 734; State v. LaMance, 348 Mo. 484, 154 S.W.2d 110; State v. Hughes, 344 Mo. 116, 125 S.W.2d 66. As the above cited authorities show, the presence or absence of motive is an evidentiary circumstance to be given such weight by the jury as they consider it entitled to under all the circumstances. Defendant would have been entitled to an instruction to this effect if

he had requested it. See Raymond on Instructions, Secs. 2 and 3711; State v. Brown, 181 Mo. 192, 217, 79 S.W. 1111. Of course, the issue of motive is more important where the evidence is circumstantial and may well be determinative of the case where it is claimed the shooting was done by accident. However, that is a matter for the jury to determine in connection with all of the facts and circumstances in evidence.

 There was evidence in this case to show some ill feeling of defendant toward deceased which would indicate a basis of motive. Likewise, there was evidence that defendant had been drinking and this has been held admissible on the issue of motive. State v. Todd, 342 Mo. 601, 116 S. W.2d 113, 117 and cases cited. Deceased went to the road with defendant and was found mortally wounded in his car. Since defendant admitted he shot deceased the issue for the jury to determine was whether the shooting was accidental or intentional. (The jury was instructed that the burden was not on the defendant to show the shooting was accidental but was on the State to prove beyond a reasonable doubt the elements of the offense set out in the instructions.) The State's evidence, if believed by the jury, indicated that the shot was not fired through the windshield glass in the manner described by defendant and that it was fired from a shorter distance than the probable positions of the parties if deceased had been on the front bumper as stated by defendant. The only blood stains found were on the side of defendant's car. The circumstances described by deceased's wife and Mr. and Mrs. Meyer, as to the time interval between defendant's call to deceased and the shot, the starting of defendant's car for the first time thereafter, the immediate crash against the large rock, and defendant's conduct and first statements to Meyer and to the officers, contradict his later account; and it would not be unreasonable to believe that the windshield was broken by his wife being thrown against it, when the car struck the

rock, instead of by the shot. Likewise, the fact that the defendant had the deer slug cartridge in the gun when he said he was looking for quail was unexplained. In determining the sufficiency of the evidence to sustain a conviction, we consider as true the evidence favorable to the State and the favorable inferences reasonably to be drawn therefrom; and evidence to the contrary is rejected. State v. Sheard, Mo. Sup., 276 S.W.2d 196, 200 and cases cited. Our conclusion is that there was substantial evidence to show that defendant was guilty of murder in the second degree.

We have examined the record and find no error respecting the sufficiency of the information, verdict, judgment and sentence.

The judgment is affirmed.

All concur.