**STATE of Missouri,
Plaintiff-Respondent,**

v.

**Raymond CRABTREE,
Defendant-Appellant.**

**No. 39928.**

Missouri Court of Appeals,
Eastern District,
Division One.

Nov. 24, 1981.

Terry J. Flanagan and Joan Berger, St. Louis, for defendant-appellant.

Brian P. Seltzer, Asst. Atty. Gen., Jefferson City, William N. Seibel, Jr., Asst. Pros. Atty., St. Charles, for plaintiff-respondent.

STEPHAN, Judge.

Defendant was convicted of assault with intent to kill, § 559.180 RSMo 1969, his case having been tried to a jury in St. Charles County. He appeals from a judgment sentencing him to twenty years in prison. We affirm.

We begin with a brief statement of the essential facts. Additional facts will be introduced as needed in discussing the issues.

Defendant Raymond Crabtree has a daughter named Linda. In late September of 1976, the time of the offense under consideration, Linda had a boyfriend named Charles Newman, the victim in this case. Linda and Charles were married prior to trial.

On the morning of September 23, 1976, Charles and Linda arrived at defendant's trailer in order to pick up some clothes for Linda and for her daughter. Linda went inside, leaving Charles sitting in the car alone. Linda testified that while inside the trailer, she had conversations with defendant in which defendant made derogatory remarks about Charles, asked her to stop seeing Charles, and stated that she "belonged to him [defendant] and no one else."

Thereafter, defendant went out to the car in which Charles was sitting. Defendant testified that Charles threatened him, but Charles's testimony was that no threats occurred; rather, according to Charles, he first became aware of defendant when the latter was standing outside the passenger side of the car, pointing a gun at Charles's head through the right rear window of the car. Defendant then stated that he did not want Charles whipping Linda's daughter (defendant's granddaughter). Charles pushed the gun away, and the gun subsequently discharged. Charles was struck in the cheek and the bullet exited through the top of his head. He fell out of the driver's side of the car and recalled spitting out his false teeth, a piece of a bullet and blood. Defendant's evidence at trial tended to suggest that this was an accident. Defendant admitted at trial that Charles was shot a second time, this time intentionally by defendant in self-defense when the victim, lying on the ground, reached for defendant's trouser cuff. The second shot struck Charles in the right shoulder. Linda testified that after the second shot, defendant stated, "One down, one revenge completed. Three to go. If I can't have you, no man will."

Two questions must be addressed at the threshold of this appeal: (1) were defendant's constitutional rights violated by the

delay in the preparation of his trial transcript?; (2) if so, should this court either order his release from custody or grant him a new trial, or is another remedy indicated?

The factual background of these questions is as follows. Defendant was tried and convicted in early November of 1977. Defendant's trial counsel filed a notice of appeal on December 9, 1977. In March of 1978, on advice of trial counsel, defendant filed a motion to proceed in forma pauperis. In April of 1978, trial counsel was granted leave to withdraw from the case, and defendant's motion and application in forma pauperis was sustained. In August of 1978, defendant filed a motion for appointment of counsel to perfect appeal and a motion to perfect appeal as a poor person. These motions were granted at the end of August, 1978, and the public defender was appointed to represent defendant. On October 19, 1978, the public defender requested that the court reporter prepare a transcript. Defendant's brief asserts that defendant was unaware of the fact that his trial counsel had not made such a request earlier.

On November 8, 1978, defendant filed a civil suit for damages and injunctive relief in federal district court against the court reporter. Defendant apparently undertook that action pro se. Since this action was taken less than three weeks after the October 19 request for the transcript, the question arises whether defendant sought this remedy on the strength of his belief that the transcript had been requested long before, or whether he foresaw at this early date that there would be a lengthy delay in production of the transcript. The record is silent on this matter. In any event, this suit was dismissed in March of 1979 because of certain deficiencies in defendant's pleadings.[1] Meanwhile, in late November of 1978, the circuit court had determined after a hearing that defendant was not indigent and therefore not entitled to the public defender's assistance. Between December 8, 1978 and April 1, 1979, defendant wrote several letters to the court reporter, to the

circuit court, and to this court concerning the delay in obtaining his transcript; he repeated these efforts between August 27, 1979 and July 5, 1980.

In September of 1979, this court found the court reporter to be guilty of criminal contempt for failure to deliver several transcripts on appeal, and sentenced her to six months' imprisonment. Defendant's case was not included in the order. On July 10, 1980 the court reporter sent defendant a letter informing him that his transcript had been completed. Over four months later, on November 14, 1980, defendant filed the first of several motions for extension of time to file transcript, which was granted by this court. Defendant attributes these delays after July 10, 1980 to the need for correcting alleged inaccuracies in the transcript. During the fall of 1980, defendant presented the transcript to the prosecutor's office and to his trial counsel for their review and suggested corrections. On January 29, 1981, defendant moved for the trial court to review his transcript. This motion was sustained on March 4, 1981. Defendant filed his brief on appeal on June 11, 1981. The record reflects that defendant was in prison throughout the period of the delay in preparation of his transcript.

The issue presented appears to be one of first impression in Missouri.

■■■ The Sixth Amendment to the United States Constitution guarantees to a defendant faced with a criminal charge the right to a speedy trial, but does not guarantee to a convicted criminal the right to a speedy appeal. *Rheuark v. Shaw*, 477 F.Supp. 897, 908[7] (N.D.Tex.1979), aff'd., 628 F.2d 297 (5th Cir. 1980). When a state provides the right to appeal, however, it must meet the constitutional requirements of due process and equal protection, and a substantial delay in the processing of an appeal may exceed the limits of due process. *Rheuark*, 628 F.2d at 302; *Doescher v. Estelle*, 477 F.Supp. 932, 934 (N.D.Tex.1979); *People of Territory of Guam v. Olsen*, 462 F.Supp. 608, 613 (D.Guam 1978). See also

---

1. Although the federal court's memorandum is not specific, such a dismissal is normally with

prejudice. See *Pic-Walsh Freight Co. v. Cooper*, 618 S.W.2d 449, 454 (Mo.App.1981).

*Petition of Williams*, 378 Mass. 623, 393 N.E.2d 353, 354[1] (Mass.1979).

██ As the Fifth Circuit Court of Appeals has noted, however, "not every delay in the appeal of a case, even an inordinate one, violates due process." *Rheuark v. Shaw*, 628 F.2d at 303[6]. Both parties suggest that we examine four factors used by the Fifth Circuit and other federal courts to determine whether a due process violation has occurred, to-wit: (a) the length of the delay; (b) the reason for the delay; (c) defendant's assertion of his right; (d) prejudice to the defendant. Id., *Rheuark v. Shaw*, 477 F.Supp. at 908; *Doescher v. Estelle*, 454 F.Supp. 943, 947 (N.D.Tex. 1978). See *Barker v. Wingo*, 407 U.S. 514, 530, 92 S.Ct. 2182, 2191, 33 L.Ed.2d 101, 117 (1972).

### 1. Length of the Delay.

The state concedes that there was a delay of twenty-one months between defendant Crabtree's request for a transcript and his notification by the court reporter that his transcript had been prepared. In the *Rheuark* case, supra, relied on heavily by both parties, federal courts, taking into account the four factors alluded to earlier, found due process violations in cases where the delays in transcript preparation were nine, twenty, and twenty-three months. 628 F.2d at 300; 477 F.Supp. at 910. The Supreme Court Rules in this state contemplate that normally a transcript will be ready within ninety days of the filing of the notice of appeal, see Rule 81.18 (1981 and 1979 editions), and possibly within sixty days of defendant's request for the transcript. See Rule 81.12(c) (1981). Otherwise, appellant must seek an extension from the appellate court, Rule 81.19 (1981; formerly, extension was sought in the trial court, see Rule 81.19, 1979 edition). While we note that such extensions are often granted, we also note that a delay seven times longer than the contemplated three-month period is extraordinary.

### 2. Reason for the Delay.

The state concedes that the twenty-one month hiatus in question is attributable to the court reporter's backlog. Defendant states in his brief that the backlog was caused, at least in part, by the fact that the court reporter suffered "some form of emotional collapse." Neither the backlog, the collapse nor the resulting delay may be blamed upon either the defendant or the state.

### 3. Defendant's Assertion of His Rights.

It is clear from the record in this case that between December 8, 1978, less than two months after the public defender ordered a transcript, and July 5, 1980, five days before notification that the transcript was ready, defendant made efforts to hasten the completion of his trial transcript. These efforts included letters to various officials, a "Motion to Provide Transcript," and a civil suit for damages and injunctive relief filed in federal court. Certainly, the record indicates that defendant, in effect, vigorously "demanded a more rapid appeal," see *Rheuark*, 477 F.Supp. at 909, and the state does not contend otherwise.

### 4. Prejudice Resulting to Defendant.

██ When, as here, an appellate court affirms a defendant's conviction on the merits, the question of whether that defendant has suffered prejudice through an inordinate delay in his appeal is a difficult one. At one extreme, some courts have said, in effect, that affirmance of a conviction nullifies a due process claim on the basis of a delayed appeal. *Johnson v. Wyrick*, 381 F.Supp. 747, 765[30] (W.D.Mo.1974); *People v. Missouri*, 100 Mich.App. 310, 299 N.W.2d 346, 352–353[7] (1980).[2] Cf. *Dowd v. U. S. ex rel. Cook*, 340 U.S. 206, 210, 71 S.Ct. 262, 264, 95 L.Ed. 215, 219 (1951). At the other extreme is language from opin-

---

**2.** According to the Michigan Court of Appeals, "[t]he remedy for dilatory review is review itself. As our full consideration of the merits of defendants' appeal negates any claim of prejudice arising out of the delay in reaching this Court, we conclude that defendants were not denied due process of law." 299 N.W.2d at 353.

ions suggesting that undue delay in and of itself warrants discharge of the defendant. *People of Territory of Guam v. Olsen*, 462 F.Supp. 608, 613 (D.C.Guam 1978). We reject the latter measure as far too drastic where, as here, no trial error appears. The mere passage of time between the filing of a notice of appeal and the completion of the trial transcript should not void a conviction, unless it clearly appears that the delay in some way impairs a defense which would otherwise be available to the defendant where a new trial is ordered for trial error. *Rheuark*, supra, 628 F.2d 297, 303, fn. 8. Similarly, inordinate delay, in and of itself, should not require a new trial. To order a new trial for such reason alone would be to remedy delay and uncertainty by introducing more delay and uncertainty into the disposition of a criminal matter,[3] not necessarily benefiting the accused and certainly eroding public confidence in the judicial system. While we are not insensitive to the arguments made in some cases concerning the anxiety of persons convicted who are awaiting the outcome of their appeals, we note that the difference between the inevitable delay from conviction to disposition on appeal and an inordinate delay is one of degree and not substance.

■ Defendant's motion to reject transcript includes a claim that the delay in preparation of the transcript resulted in "inaccuracies and omissions" that prejudice defendant's due process rights. We have reviewed the record thoroughly and find that the claimed defects in the transcript, even if they exist, are insufficient to prejudice defendant's rights. The transcript was reviewed and corrected by trial counsel, and approved by the trial judge. Our inquiry need proceed no further. *State v. Davis*, 573 S.W.2d 114, 116 (Mo.App.1978).

Defendant's motion to reject transcript and to grant defendant immediate release or, in the alternative, a new trial, is denied.[4]

3. Defendant's brief concedes that by granting a new trial this court would be "countenancing further delays." See *Rheuark*, supra, 628 F.2d at 303, n.8.

4. Defendant may have a cause of action for damages against the reporter. See, e.g.,

We turn now to the allegations of error at trial raised in defendant's appeal.

At trial, Linda Crabtree Newman testified that one night in August of 1976 she returned to defendant's home, where she was living at the time, after a date with Charles Newman. She testified that defendant tried to dissuade her from continuing to see Charles, who in defendant's view was not good enough for her. According to Linda, defendant then said that she belonged to him and to no one else, and that he could please her sexually better than could Charles. During the conversation, defendant made what Linda characterized as "sexual advances" towards her, although the only specific act referred to was defendant's grabbing of her arm. The testimony described above was admitted over defendant's objections. He argues that admission of this testimony was error and that the testimony prejudiced the jury against defendant.

The issue presented may be divided into two parts. The first part of the issue concerns the admissibility of evidence to show that the accused had a motive to commit the crime with which he is charged. The parties agree that the testimony tended to show that defendant had a motive for the shooting: jealousy. Defendant asserts that since motive is not an element of the offense with which defendant was charged and since defendant did not deny the acts that gave rise to the charge, but rather tried to show accident and self-defense, therefore evidence of motive was irrelevant. We disagree.

■ Motive was certainly not an element of the crime with which defendant was charged in this case, and the state makes no claim to the contrary. Motive, however, is an evidentiary circumstance that the jury

*McLallen v. Henderson*, 492 F.2d 1298, 1299–1300 (8th Cir. 1974) and *Grant v. Fletcher*, 564 S.W.2d 944, 946 (Mo.App.1978). This is an issue which need not be and is not decided here.

may consider. *State v. Henderson,* 301 S.W.2d 813, 816–817[1] (Mo.1957). See *State v. LaMance,* 348 Mo. 484, 154 S.W.2d 110, 114[5] (1941).

There were two shots fired in this case. Defendant raised the defense of accident with respect to the first shot. Evidence that a defendant had a motive to shoot the victim intentionally tends to refute the defense of accident, and when added to other circumstances may convince the trier of fact that defendant committed the crime in question. See *State v. Henderson,* supra, 301 S.W.2d at 817[1]; *State v. Jones,* 249 Mo. 80, 155 S.W. 33, 36[5] (Mo.1913). See also *State v. Stapleton,* 518 S.W.2d 292, 296–297 (Mo. banc 1975). In the case at bar, evidence of defendant's attitude toward his daughter and Charles Newman, as revealed in the August, 1976 encounter, was relevant to the issue of whether or not the first shot was fired by accident.

Defendant admitted firing the second shot but claimed self-defense. Evidence of motive would tend to discredit such a defense. See *State v. Richardson,* 515 S.W.2d 571, 573[2] (Mo.1974).

The second part of defendant's first issue concerns whether Linda's testimony about the August, 1976 incident was inadmissible because it was evidence of a crime committed by defendant other than the one with which he was charged, therefore irrelevant and tending to prejudice the jury against him. Defendant argues in his brief that "the testimony of Linda Newman constituted proof of another crime, that is, incest or rape." The simple answer to this argument is that the grabbing of another's arm, even when accompanied by sexually explicit invitations but nothing more, does not constitute evidence of either crime. See § 563.220 (incest), § 559.260 (rape), RSMo 1969, which were in effect at the time of the incident. As presented, this argument is patently without merit. Assuming arguendo that the grabbing of his daughter's arm under the circumstances described constituted an assault or other crime by the defendant, it would neverthe-

less be admissible to show motive, i.e. jealousy, for shooting Charles.

The case law on this point is well settled. "[O]therwise relevant evidence on the issue of motive [is not] rendered inadmissible because it might also tend to constitute proof of another crime or discredit defendant's character." *State v. Mercer,* 618 S.W.2d 1, 9 (Mo. banc 1981). Accord, *State v. Holt,* 592 S.W.2d 759, 775 (Mo. banc 1980); *State v. Richardson,* 515 S.W.2d 571, 573 (Mo. 1974).

Moreover, the record indicates that the prosecutor did not elicit Linda's testimony in a way calculated to inflame the jury against the defendant. See *State v. Holt,* supra, 592 S.W.2d at 775. The prosecutor also apparently refrained from questioning her about a similar incident which had occurred several months before. The probative value of Linda's testimony was by no means outweighed by any adverse effect it could have had on defendant in the eyes of the jury. We rule against defendant on this issue.

In his second point on appeal, defendant complains that the trial court should not have sustained objections by the state made to two questions asked of defendant by his counsel.

On direct examination, defendant testified that at some time prior to the shooting, on an unspecified date, he and Charles Newman "had a misunderstanding," as a result of which Charles shoved defendant through the door at the St. Charles Clinic. Defense counsel then asked the following question:

"Had you on that date, on that day at the St. Charles Clinic, been involved in an argument because Rick Ellis had been accused of having had this sexual relationship with his step-daughter?"

The state's relevancy objection to this question was overruled. Defense counsel then repeated the question in a slightly different form:

"Ray, did you on that day at the St. Charles Clinic get involved in an argument with Rick Ellis and get hit by Rick

Ellis because Linda, your daughter, accused Rick Ellis of having a sexual relationship with his step-daughter?"

The state's relevancy objection to this question was sustained and defense counsel pursued another line of questioning.

On its face, the above question asked of defendant concerns defendant's relationship with one Rick Ellis, a party who was not identified further through any evidence at trial; nor did defense counsel identify him further or make an offer of proof. No record whatsoever was made concerning how the question pertained to the relationship between defendant and Charles Newman. The trial court did not err in determining, based on the facts before it, that the question pertained to irrelevant matters. See *State v. Biswell*, 352 Mo. 698, 179 S.W.2d 61, 66[7] (Mo.1944); *State v. Roseberry*, 283 S.W.2d 652, 658 (Mo.App.1955).

■ The second question to which, in defendant's view, the trial court should not have sustained the state's objection occurred on re-direct examination. Defense counsel sought to elicit from defendant testimony that the latter went to the St. Charles Prosecuting Attorney's office two or three days before the shooting to inquire about receiving protection from Chuck Newman. In his offer of proof, defense counsel suggested that the prosecutor's office told defendant to go to the police if he needed protection. The state's objection was on the grounds that this matter was beyond the scope of re-direct examination: on cross-examination, the state questioned defendant on his failure to call police after the victim's alleged threats on the morning of the assault, and defendant's questions about the prosecuting attorney's office were irrelevant as rebuttal.

As with the exclusion of the "Rick Ellis" testimony, defendant concedes that this allegation of error is not preserved for appellate review, since it was not included in his motion for new trial. *State v. Umfleet*, 587 S.W.2d 612, 615[4] (Mo.App.1979). There is no plain error here. See Rule 29.12(b). Defendant had the opportunity to bring the matter of police protection up on direct examination and failed to do so. Evidence that defendant sought some sort of protection several days before the incident, while arguably relevant to his self-defense claim, would have done little to offset the overwhelming weight of the evidence that defendant was not in danger when he fired the second shot at the victim. No manifest injustice resulted to defendant from exclusion of this testimony. We rule defendant's second point against him.

Judgment affirmed.

STEWART, P. J., and WEIER, J., concur.